**BAY AVIATION SERVICES CO., Predecessor of Lawrence Properties Co.,
Plaintiff,
v.
SOUTHLAND AVIATION, INC.,
Defendant,
The Southard Production Co., Defendant to Interpleader.**

Civ. A. No. 815.

United States District Court
W. D. Arkansas,
Texarkana Division.

Dec. 4, 1962.

single-engine Beechcraft Bonanza aircraft into a twin-engine aircraft, which was done at the request and order of and for defendant, Southland Aviation, Inc.; that on April 15, 1961, the work to be done by the plaintiff was completed and the converted aircraft was returned to Southland Aviation, Inc., that the charges for the work done and the materials furnished amounted to $17,601.-50, and Southland Aviation, Inc., has agreed that this amount is due and payable from it to the plaintiff; that this amount has been due and payable from Southland to the plaintiff since April 15, 1961, and demand has repeatedly been made for payment of the amount due, and that Southland has refused and continues to refuse to make payment of the amount due from it to plaintiff.

The plaintiff prayed that it have and recover of and from Southland the sum of $17,601.50, plus interest thereon at the rate of 6 percent per annum from April 15, 1961, and its costs.

The defendant, Southland Aviation, Inc., filed its answer on April 28, 1962, in which it denied the above allegations. On the same date it filed a "Counterclaim for Interpleader," in which it alleged that at the request of one W. D. Johnson, the plaintiff Bay Aviation Services Co., undertook to modify a single-engine aircraft belonging to the said W. D. Johnson, and converted the same into a twin-engine aircraft, and that the defendant, Southland Aviation, Inc., had nothing to do with the modification and conversion of said aircraft nor was it obligated to pay for the same. The defendant in its counterclaim further alleged that after the plaintiff, Bay Aviation Services Co., had purportedly converted said aircraft, it undertook to make delivery to the said W. D. Johnson; that the work was not completed and was not properly done, and at the request of W. D. Johnson the aircraft was flown to Hope, Arkansas, pending compliance by the plaintiff with its obligation to complete its work on the aircraft; that said aircraft has remained stored in defendant's hangar in Hope, Arkansas, for the

Wright, Lindsey, Jennings, Lester & Shults, Little Rock, Ark., for plaintiff.

Graves & Graves, Hope, Ark., for Southland Aviation Inc.

Arnold & Arnold, Texarkana, Ark., for Southard Production Co.

JOHN E. MILLER, District Judge.

Plaintiff, Bay Aviation Services, Co., filed its complaint on March 15, 1962, in which it alleged that commencing in September 1960 it performed services and furnished engineering and materials in connection with the conversion of a

128

past year, and during that time the defendant repainted the aircraft at the request of the plaintiff and the said W. D. Johnson; that the said W. D. Johnson sent to the defendant a check of the Southard Production Co. in the principal sum of $17,601.50, but instructed this defendant not to deliver said check to the plaintiff until the plaintiff had fully completed its work on the aircraft in a satisfactory manner, and both the said W. D. Johnson and the plaintiff, Bay Aviation, have instructed the defendant not to deliver the aircraft to the other and the defendant has repeatedly requested the plaintiff and the said W. D. Johnson to instruct it as to what disposition to make of the said $17,601.50 and of the said aircraft.

In its counterclaim the defendant prayed as follows:

"(1) That the Court order W. D. Johnson and the Southard Production Company to be made party Defendants to respond to the complaint and to this counterclaim.

"(2) That the Court order the Plaintiff and W. D. Johnson and The Southard Production Company to interplead their respective claims.

"(3) That the Court adjudge whether the Plaintiff or W. D. Johnson or The Southard Production Company is entitled to the sum of money or what part thereof.

"(4) That the Court adjudge whether the Plaintiff or W. D. Johnson or The Southard Production Company is entitled to the aircraft.

"(5) That the Court discharge the Defendant from all liability in the premises except to the person, firm or corporation it shall adjudge entitled to the sum of money and the person, firm or corporation it shall adjudge entitled to the aircraft.

"(6) That the Court award to the Defendant a reasonable sum for repainting said aircraft and for storing the same until said aircraft is delivered under the orders of this Court.

"(7) That the Court award to the Defendant its costs and attorneys' fees."

On July 11, 1962, W. D. Johnson and the Southard Production Company filed their joint answer to Southland Aviation, Inc.'s counterclaim for interpleader, in which they stated that all actions alleged to have been taken by W. D. Johnson were taken by him on behalf of Southard Production Co., the owner of the aircraft in question; that the agreement for modification of such aircraft was an agreement between Southard Production Co. and Southland Aviation, Inc., it being the understanding of the parties thereto that the modification work actually would be performed by the Oakland Airmotive Co., predecessor of Bay Aviation Services Co. W. D. Johnson and Southard admit the allegations of the counterclaim for interpleader with the exception that they denied "want of knowledge that the aircraft in question has been repainted."

On the same date W. D. Johnson and Southard Production Co. filed their counterclaim against Bay Aviation Services Co., in which they stated their willingness that Southland pay over to Bay Aviation the $17,601.50 now in possession of Southland at such time as the modification of the aircraft in question is completed pursuant to the original contract between Southard and Southland.

On July 12, 1962, Bay Aviation filed its reply to the counterclaim of W. D. Johnson and the Southard Production Co., in which it alleged that the conversion of the aircraft in question has been satisfactorily completed and that Southland is liable to Bay Aviation in the amount of $17,601.50, plus interest.

On August 29, 1962, it was ordered by this court that the defendant, Southland Aviation, Inc., forthwith deposit in the registry of the court the sum of $17,601.-50 which had been sent to it by W. D. Johnson.

On September 22, 1962, W. D. Johnson and Southard Production Co., defend-

ants to the interpleader, filed their motion for leave to amend their counterclaim against Bay Aviation Services Co., which motion was granted by the court over the objection of the plaintiff.

On September 26, 1962, the defendants to the interpleader filed their amended and substituted counterclaim against Bay Aviation, in which they stated that W. D. Johnson, individually, withdraws as a complaining party against the plaintiff since all alleged actions taken by him with respect to the matters pleaded in plaintiff's complaint and defendant's answer and counterclaim were taken by him on behalf of Southard, the owner of the aircraft in question.

In the amended and substituted counterclaim, Southard alleged that the plaintiff, Bay Aviation, had breached and failed to perform the contracts and agreements with Southland Aviation for the conversion of the aircraft in question, and therefore is not entitled to recover on said contracts and agreements. Southard further alleged that on April 15, 1961, and subsequent thereto the plaintiff agreed with Southard and with Southland Aviation to complete the conversion as contracted and to repair and replace all defective items at its own cost and expense, and to pay Southard the sum of $1,874.50 as agreed damages for the failure of the plaintiff to return to Southard the propeller which was on the aircraft when delivered to the plaintiff for conversion; that the plaintiff, Bay Aviation, has failed to perform said agreements and that in making said agreements the plaintiff was at all times acting by and through its duly authorized officers and agents.

Southard specifically alleged that the plaintiff has failed to perform its contracts and agreements in that it:

"1. Failed to pay $1,874.50 for loss of propeller.

"2. Failed to install fuel injection engines on said aircraft.

"3. Installed A1C engines instead of A1A engines on said aircraft.

"4. Installed improperly designed exhaust stacks in said engines.

"5. Installed improperly designed air intake manifolds and systems in said engines.

"6. Installed improperly designed electrical system in said aircraft, or alternatively, failed to install an electrical system sufficient in capacity and size of wiring.

"7. Installed poorly designed cowlings on said engines, and failed to install cowlings on said engines in a good and workmanlike manner.

"8. Installed improperly designed oil breather systems.

"9. Failed to repaint said aircraft in a good and workmanlike manner.

"10. Failed to install fuel filters and a fuel filtering system on said engines."

In the alternative, Southard alleged that if the plaintiff has substantially performed its contracts and agreement, which is not admitted but which is denied, then Southard is entitled to judgment against the plaintiff for a reasonable cost of completing said contracts and agreements and repairing the defective work as heretofore specifically set out, which cost is alleged to be $25,000.00.

Southard further alleged that it has suffered damages because of plaintiff's breach of the said contracts and agreements, which damages are specifically set forth as follows:

"1. $1,874.50 for lost propeller.

"2. $25,000.00, being the reasonable cost to complete said contracts and agreements and to repair defective work.

"3. The loss of use of its said aircraft from October 1, 1960, to date, a period of 24 months, in the sum of $33,600.00 calculated at the rate of $35.00 per hour and 40 hours per month for each month's loss of use, the reasonable rental value of said aircraft.

"4. The loss of services of its secretary-treasurer and agent, W. D. Johnson, during six trips to Hope, Arkansas, and one trip to California, for a period of seventeen days total, to its damage in the sum of $1,700.00.

"5. $2,000.00, being the expense of travel to California on one occasion and to Hope, Arkansas, on six occasions."

On October 1, 1962, the defendant, Southland Aviation, Inc., filed its motion to dismiss against W. D. Johnson.

On October 3 and 4, 1962, the case was tried to the court. At the beginning of the trial the attorney for the plaintiff stated in open court that the name of the plaintiff, Bay Aviation Services Co., had become Lawrence Properties Co. since the institution of this suit, and in accordance with such statement the name of Bay Aviation's successor was duly entered on the record to reflect the change; but for purposes of the trial the name of its predecessor, Bay Aviation Services Co., was used since that was the name of the plaintiff during the course of the dealings in question. At the same time, by consent of the counsel for the parties, it was ordered by the court that the claim of Southland Aviation, Inc., against the defendant to the interpleader, W. D. Johnson, be dismissed without prejudice.

At the conclusion of the presentation of the testimony the case was taken under advisement by the court, subject to submission by the parties of briefs in support of their respective contentions. The briefs have been received, and the court, having considered the pleadings, the testimony adduced at the trial, the exhibits and briefs of counsel, now makes and files herein its findings of fact and conclusions of law, separately stated.

FINDINGS OF FACT

1.

The plaintiff, Bay Aviation Services Co., is a corporation organized under the laws of the State of California with its principal place of business in San Francisco, California. Its successor, Lawrence Properties Co. is a California corporation with its principal place of business in said State. Defendant, Southland Aviation, Inc., is a corporation organized under the laws of the State of Arkansas with its principal place of business in Hope, Arkansas. The defendant to the interpleader, Southard Production Co., is a corporation organized and existing under the laws of the State of Ohio with its principal place of business in Dayton, Ohio. The amount in controversy in this case, exclusive of interest and costs, exceeds $10,000.00.

2.

The predecessor of Bay Aviation was Oakland Airmotive Co., which was incorporated as a California corporation on March 15, 1954. Pursuant to an agreement dated July 2, 1958, Oakland Airmotive acquired the rights to convert Beechcraft Bonanza single-engine aircraft to twin-engine aircraft from the original developer of the conversion plan, one David Peterson. The name of Oakland Airmotive Co. was changed to Bay Aviation Services Co., (hereinafter called Bay) on July 8, 1960, and all of the activities regarding the conversion of the aircraft in the present case was carried on by Bay.

3.

The defendant, Southland Aviation, Inc., (hereinafter called Southland), had its first business dealings with Bay on July 20, 1960, at which time it purchased a Beechcraft Bonanza that had been converted to a twin-engine aircraft (hereinafter referred to as a Super-V), delivery of which was accepted in August or early September 1960. On August 10, 1960, Southland and Bay entered into distributor agreements at a meeting attended by the principal officers of both corporations. During the remainder of 1960 and 1961, Southland flew its Super-V conversion to a number of airports in Southwestern United States pursuant to its distributor agreement with Bay. This was one of the services rendered

in relation to preparing to merchandise the Super-V in a five-state area, as provided by the distributor agreement with Bay. The original plan was for Southland and other distributors to install the conversion kits as supplied by Bay as manufacturer. However, the Super-V program never did progress beyond the stage whereby Bay manufactured and installed the conversion kits for purposes of perfecting the procedures thereof and the training of mechanics employed by its several distributors.

### 4.

W. D. Johnson is the Secretary-Treasurer of the Southard Production Company (hereinafter referred to as Southard), which is a corporation owned by his two sisters. The corporation is a vehicle used for the management of family real estate. Johnson owns no stock in Southard but he has other business activities. Johnson helped David Peterson in the development of the first Super-V conversion plan, although he had no contract with Peterson nor did he invest in the project. Johnson first contacted Oakland Airmotive, the predecessor of Bay, in 1958 and 1959 when he wrote to inquire about the Super-V conversion after it had purchased the plans from Peterson. At that time Oakland Airmotive sent Johnson a letter describing tentative details for the purchase of a Super-V conversion, and later two brochures dealing with the same conversion. These details set out in the letter and the two earlier brochures have since been superseded by a later brochure put out by Oakland Airmotive and Bay. Johnson was referred to Southland as Bay's distributor in the local area in August of 1960. From that date on Johnson's negotiations with Bay were conducted through Southland as Bay's distributor.

### 5.

The airplane in question was purchased by Johnson personally in 1948. Approximately a year later the ownership of the plane was transferred to Southard to be used by Johnson in the management of that corporation's business. Having worked with Peterson in the development of the Super-V conversion and having received the preliminary information from Oakland Airmotive after it had purchased Peterson's conversion plans, Johnson decided that he desired to have Southard's plane, a Beechcraft Bonanza, converted to a Super-V.

### 6.

The only brochure published by Oakland Airmotive and adopted by Bay concerning the Super-V was dated May 30, 1960. The information contained in this brochure differed from that contained in the earlier brochures put out by Oakland Airmotive and the letter written by Oakland Airmotive to Johnson containing preliminary information on the Super-V conversion, in that it set forth a complete price list and list of accessories and the latest performance data and specifications. Whereas the earlier publications had quoted a price of $15,000.00 for a Super-V conversion, this later brochure listed three grades of Super-V conversions—a standard Super-V, a custom Super-V, and a deluxe Super-V. The standard Super-V was priced at $22,500.00, and the custom Super-V and the deluxe Super-V, each including the standard conversion plus additional accessories, cost $24,295.00 and $25,695.00, respectively. Also listed were optional Super-V accessories and their prices which could be purchased separately in addition to the accessories included in the various three grades of Super-V conversions. Among other specifications the engines to be supplied were identified as "two new Lycoming 0–360 rated at 170 T.H. Tp sea level." With respect to the engines the main difference was that the later brochure states that they will have a conventional carburetion system, whereas the earlier brochures had indicated that the Super-V engines would have fuel injection. Among other engine instruments to be supplied with the standard conversion were a dual tachometer and a four-way fuel indicator. The reason that Bay did not continue to promise fuel injections with the engines was that the fuel injection system as develop-

ed by David Peterson and installed on the type of engines that he had used in his original conversion did not meet Federal Aviation Agency approval. After Bay spent $250,000 in attempting to make the Peterson fuel injection engine design conform to FAA's specifications, Bay abandoned this design and went to the Lycoming 0-360 A1A engines with conventional carburetion, fuel injection not being available with this type of engine. After the change in engine design was made, FAA type certification was issued in June 1960 to Bay as manufacturer of the Super-V conversion. Although Johnson was not aware at this time of Bay's abandonment of a fuel injection engine, this change was known to Southland at the time it purchased its Super-V conversion on July 20, 1960, as well as when its distributor agreement was signed on August 10, 1960.

### 7.

On September 16, 1960, Johnson, on behalf of Southard, signed a purchase order for a Super-V standard conversion, which order was accepted and confirmed on the same date by Southland. The order called for a standard conversion at a cost of $22,500.00 with the optional accessory of super soundproofing at a cost of $295.00. Although it is not reflected by the purchase order itself, Bay did extra work on the Southard plane which included the installation of hyper wing-tips at a cost of $295.00, and interior work consisting of new seats, new headliner, and a new floor rug at an unspecified cost. Appearing on the face of the purchase order was the following notation: "Propeller now on aircraft borrowed from another aircraft to be returned with Super-V conversion. Propeller for this aircraft to be shipped to Oakland." On the face of the purchase order Southland is identified as the "Distributor or Dealer" and Southard as the "Purchaser," but on the reverse side a blank space is used to identify the general term "Vendor," the term "Manufacturer" is used to designate Bay, and the term "Purchaser" is used to describe the buyer of the products covered by the purchase order. The provisions on the reverse side further provide, inter alia:

"This purchase order when accepted by Vendor becomes a binding contract of purchase and sale of the products shown on the face hereof upon the terms and provisions herein specified:

"1. As far in advance as is practicable, the Vendor will notify Purchase_of the specific date when the products ordered herein will be ready for delivery, which date is herein referred to as the 'fixed delivery date,' and Purchaser agrees to accept delivery on said date, or within a reasonable time thereafter, not to exceed seven (7) days.

"2. Purchaser agrees in addition to the price specified herein to pay:

"(a) For all special equipment not specified herein but subsequently ordered;

\* \* \* \* \*

"4. The products purchased herein are covered by the following Manufacturer's warranty and no other warranty:

"(a) Bay Aviation Services Company warrants those products purchased herein that are new and manufactured by Bay Aviation Service Company to be free from defects in material and workmanship under normal use and service, provided, however, that the liability of Bay Aviation Services Company under this warranty is limited to replacing or repairing any part or parts of such products which shall, within sixty days after delivery of such products to the purchaser from Bay Aviation Services Company, be returned to Bay Aviation Services Company, with transportation prepaid, and which shall upon examination by Bay Aviation Services Company be disclosed to

the satisfaction of Bay Aviation Services Company to have been thus defective. This warranty shall not in any way apply to or cover any products purchased herein which may in any manner be altered or repaired outside of the factory of Bay Aviation Services Company. No warranty is made with respect to parts, equipment or accessories not manufactured by Bay Aviation Services Company, such as engines, propellers, fuel pumps, tires, wheels, instruments, magnetos, or any other parts, equipment or accessories not manufactured by Bay Aviation Services Company even though not mentioned herein, and Purchaser must make all claims for any defects in such parts, equipment or accessories to the respective makers thereof.

\* \* \* \* \*

"5. Vendor shall not be liable to Purchaser in any way for failure or delay in making delivery on the delivery date specified by Vendor, where such delay arises from failure to secure sufficient skilled labor, materials, parts, engines, propellers, or any other essential elements necessary to the manufacture of said products, or for delays caused by strikes, fires, or causes beyond its control occurring in or in connection with the manufacture of said products, or in the manufacture or delivery of any purchase parts thereof, or where delivery is prohibited or prevented by or pursuant to any law or regulation, whether or not arising out of Manufacturer's and/or Vendor's violation thereof and in compliance therewith; and Purchaser hereby releases and discharges Vendor from any and all liability for damage or loss arising from the failure of the Manufacturer and/or Vendor to make delivery for any of the causes herein specified.

"6. It is further agreed that this purchase order, when accepted by Vendor, is the only contract controlling this sale and purchase, and that it contains all agreements, express or implied, either verbal or in writing, and Purchaser acknowledges receipt of a copy of the same. Vendor is not the agent of Manufacturer in any matter whatsoever pertaining to the sale of said products."

Although no date of promised delivery appears on the purchase order, Southland assured Johnson that the conversion would be ready within 30 days.

Other than the promise of a delivery date within 30 days and the request for extra options as heretofore set out, Johnson was not informed by the officials of Southland that Bay no longer specified fuel injection for the engines of the Super-V conversion, nor did Johnson inquire as to what went into a Super-V standard conversion as identified by Bay's brochure of May 30, 1960.

Although there was no written contract between Southland and Bay for the work to be done on Southard's aircraft other than the general distributor agreement already in existence, it was agreed between Bay and Southland that the cost of the standard conversion to Southland would be $3,000.00 less under the dealer's discount than the cost to Southard as purchaser. A representative of Southland flew Southard's aircraft to California and turned it over to Bay on September 26, 1960. At this time the market value of Southard's aircraft was approximately $6,000.00.

8.

Although Bay began the installation of a Super-V standard conversion of Southard's airplane on September 26, 1960, the plane was not ready for delivery until April 5, 1961. The reason for this unforeseen development was that in June of 1960, it was determined at the Lycoming factory that fuel injection would never be available for the 0–360 A1A

engines, and because of this Bay decided in August 1960 to change from the A1A to the A1C model of the Lycoming 0–360 since the appearance of its airscoop was more attractive and its carburetion was improved in that it embodied a full pressure fuel system which eliminated the tendency toward carburetor icing, and would be more readily adaptable to true fuel injection. Southland had been told of this decision at a distributor's meeting the first week of August 1960, but had not relayed this information to Johnson when he signed the purchase order to convert Southard's airplane on September 16, 1960. Although the A1C engines cost $2,900.00 each as opposed to the $2,000.00 cost of each A1A engine, Bay did not raise the prices of its three grades of Super-V conversion in proportion. At the time Southard's aircraft arrived in California, Bay had no A1A engines in stock, and the only engines on order from the Lycoming factory were A1C's. Since Bay was already committed to this course of action, it had no choice under the circumstances but to submit the change in engine design to the FAA for certification and approval. After a normal delay of several months in securing FAA certification for the A1C engines, Southard's aircraft was completed on the 3rd or 4th of April 1961. On April 4, 1961, Bay filed its application for an airworthiness certificate for the aircraft in question, and on the following day the aircraft was inspected and test flown by a FAA inspector, and it was found airworthy according to FAA regulations. At this time the fuel gauges of the aircraft were calibrated by the FAA inspector.

At that time the direct cost to Bay for the conversion of Southard's aircraft was $28,700.00, including labor, $14,560.00; two engines, $5,800.00; propellers, $1,110.00; fiberglass, $600.00; heater, $240.00; exhaust stacks, $395.00; and miscellaneous parts, $6,000.00.

9.

Johnson went to California with one Bob Gladney, a representative of Southland, and obtained the converted aircraft from May on April 15, 1961. Although the standard Super-V conversion calls for a matching paint job on the exterior of the new parts installed, Johnson noticed that this requirement had not been complied with when he saw the plane. Johnson also noticed that the plane's radios were not operative. A representative of Bay who was present at the time authorized Gladney to paint the aircraft and to have the radios repaired at Bay's expense upon its return to Southland. The representative of Bay also stated to Johnson that if any other defects showed up, that Bay would send the parts to Southland who would install them on the aircraft.

The representative of Bay handed an invoice dated April 7, 1961, to Gladney which was made out to Southland. The invoice set out the base purchase price of a standard Super-V conversion of $22,-500.00, less a 5 percent discount, which left a remainder of $21,375.00. To this was added the cost of labor and materials for extra work done on the airframe of the Southard plane, which made a total of $22,476.00.

Johnson delivered Southard's check for that amount to Gladney who mailed it to Southland at Hope, Arkansas. The representative of Bay noted on the invoice the receipt of a check in full, payable to Southland. However, this check was never cashed because Johnson had a discount deal with Southland, and he had worked out another arrangement with Southland for payment since he was hoping to become an agent or representative of Southland to sell Super-V aircraft.

Another invoice of the same date was made out by Bay to Southland which stated the cost of the Super-V standard conversion on Southard's aircraft at $19,500.00, which included the $3,000.00 discount to Southland as a dealer. To this was added the cost for labor and materials for the extra work done on the airframe, making a total of $20,601.-50. This invoice has not been marked **paid** since the amount involved here,

less $3,000.00, is the subject matter of the present suit by Bay.

### 10.

On the return flight and at its conclusion Johnson noted the following defects and deficiencies which grew out of the work done by Bay other than the necessity for paint and radio repair as set out above: Certain of the exhaust stacks and the air intake scoops on the engines became cracked in flight; the oil breather systems of the engines permitted oil to flow on the undersides of the wings and obscure the landing lights in the wheel wells; the fuel gauges did not appear to operate properly; one of the two compasses which had originally been in the aircraft was missing; there were no recording tachometers for the engines; an oxygen bottle was missing from the airplane; and various parts of the interior, such as screws in the control wheel, the carpet, seat material, cover for the baggage compartment, boot covers for the emergency gear extension lever, and rubber covers for the zerk grease fittings were either of an inferior quality or were missing.

Because of these deficiencies and mechanical defects, Johnson required Gladney to take the plane back to Southland at Hope, Arkansas, so that they could be remedied. Subsequently Johnson discovered that small cracks appeared near the screw holes of the fiberglass engine cowlings, that the engines were without fuel filters, the engines became difficult to start, and the borrowed propeller that had been sent out with Southard's plane could not be accounted for by Bay.

### 11.

In May 1961 Southland completely repainted the aircraft pursuant to the request of Bay at the time of delivery, the billing for which has been deferred pending the delivery of the aircraft to Southard. On June 28, 1961, the radios in the aircraft were repaired by Southland as authorized by Bay at the time the aircraft was delivered.

### 12.

On May 25, 1961, the deficiencies and mechanical defects noted by Johnson had not been remedied even though Johnson had called and written representatives of Bay informing them of the situation. At this time Johnson and a representative of Southland met the sales manager of Bay to discuss the completion of the conversion and the repairing of the defective work. At this time it was agreed among the parties that Bay would deduct $3,000.00 from the total of $20,601.50 on its invoice to Southland dated April 7, 1961, which deduction would include the cost of the lost propeller and would compensate Southard for the failure to install fuel injection. Above and beyond this, Bay agreed to send the necessary parts to Southland to finish the job and repair defective work.

On June 23, 1961, Johnson went to Hope, Arkansas, to take delivery of the aircraft in question, but when he arrived there he found that the parts which Bay had promised to send to Southland to be installed on the plane had not arrived. Johnson and an officer of Southland called Bay and talked to Bay's sales manager, who reaffirmed the agreement at which the parties had arrived on May 25, 1961. The amount of $17,601.50 owed by Southland to Bay was reconfirmed, and it was agreed that this money should be sent to Bay when all the parts necessary to replace those that had broken were sent by Bay and received by Southland to be installed on Southard's plane. On the same date Southland received Southard's check in the amount of $17,601.50, which check was cashed with the intention of sending this amount on to Bay when Johnson would accept the aircraft on behalf of Southard.

Johnson made several more trips to Southland's location at Hope, Arkansas, to pick up the aircraft, but each time it was found that either the work had not been completed or that the aircraft could not be started. On August 12, 1961, Johnson made another trip to Hope to obtain the aircraft, and when he was unable to, he took a flight in Southland's

own Super-V conversion. This flight terminated in a crash near Ardmore, Oklahoma, of which Johnson survived. The day following the crash the chief engineer of Bay came to Johnson's hospital room and stated that he wanted to take Southard's aircraft back to California and repaint it, rewire it, fix the cowlings, put in flexible airscoops, fix the exhaust stacks, and remedy the other defects and deficiencies complained of by Johnson, and that Bay would take the plane to California, where it could utilize its trained mechanics and equipment, and return it at its own expense. Johnson refused this request by Bay, and since that date he has steadfastly refused subsequent requests by Bay to remedy any defects or deficiencies in the aircraft at its own factory in California.

13.

With regard to the parts that Bay was supposed to send to Southland, new exhaust stacks and new air intake manifolds have been sent by Bay and have been installed by Southland. Fuel filters, wiring and new engine cowlings have not been received. The airplane is still difficult to start, and this trouble has been diagnosed as either arising from insufficient battery cables to the engine starters or an incorrect setting of the vibrators, or both.

Southland has painted the aircraft in compliance with Bay's instructions at the time of delivery, the cost of which is $750.00. The radio also has been repaired at a cost of $136.11. The bill for storage of the aircraft by Southland figured from September 1961 amounts to $340.00.

The values of the remaining deficiencies or defects are as follows: Fair market value of the missing propeller, approximately $750.00; replacement of battery cable and labor, approximately $100.00; correction of oil-throwing problem by utilization of a collection system developed by Piper Aircraft, parts and labor, $100.00; installation of a fuel filter system, parts and labor, $125.00; and adjustment of starting vibrators would amount to a nominal sum only. As for the replacement of the fiberglass engine cowlings, the ones presently installed on the aircraft are sound enough so that any minor repair could be made of them.

DISCUSSION

The first issue, as presented by Bay's complaint, is whether Bay is entitled by its performance to recover the amount of $17,601.50, which it sued for on its contract with Southland to complete a purchase order for a Super-V standard conversion of the aircraft owned by Southard.

█ In this connection, the first question concerns the legal relationship of the parties involved in the present suit. The answer is found in 2 C.J.S. Aerial Navigation § 18, which states as follows:

"The delivery of an airplane by the owner to one who contracts to repair it constitutes a bailment for hire, the airplane being held in trust for the special object of repair, and the general ownership being retained by the owner."

In the present case Southard is the owner-bailor. Since a provision of the purchase order impliedly makes Southland, as distributor, the agent of Southard as purchaser, the delivery of Southard's plane by Johnson to Southland makes Southland a sub-bailor, and when Southland's representative delivered the aircraft to Bay for conversion, Bay became the bailee for hire.

█ Black's Law Dictionary, 4th Ed., defines a bailment as follows:

"A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust."

■ The type of bailment involved in the present case is indicated in 8 C.J.S. Bailments § 8, at page 351, as follows:

"Bailments for mutual benefit are divided into several classes, * * * the hire of services on or about a thing, or locatio operis faciendi, when work and labor or care and pains are to be performed or bestowed on the thing delivered; * *."

■ In the present case the contractual terms agreed on among the parties have been both oral and written, express and implied. However, when there is a bailment of an article for work to be performed on it, the contract requirements are not strict. As stated in 8 C.J.S. Bailments § 22, as follows:

"Subject to statutory regulations, the rights, duties, and liabilities of the bailor and the bailee must be determined from the terms of the contract, between the parties, whether express or implied. Where there is an express contract, the terms thereof control, since both the bailor and the bailee are entitled to impose on each other any terms they respectively may choose, increasing or diminishing their rights, and their express agreement will prevail against general principles of law applicable in the absence of such an agreement.

"In the ordinary bailment the mutual rights of the parties are often, if not usually, so inadequately fixed by their agreement that rules of law not based on the agreement, although not inconsistent with it, must be called on to supply the deficiency. Accordingly, where a simple contract of bailment exists, the rights and duties of the parties are controlled by a contract which is implied by law from their conduct, or, as otherwise expressed, are determined by implication from their conduct and the law governing simple contracts of bailment.

\*    \*    \*    \*    \*    \*

"In a bailment for alteration or repair of the thing bailed, the bailee impliedly agrees that the thing when so altered or repaired will be reasonably fit for, or capable of, the use intended, of which use the bailee shall know."

Turning to the facts in the present case, it is apparent that the parties were guided in their conduct by a hodgepodge of agreements and statements pertaining to the installment by Bay of a standard Super-V conversion of Southard's aircraft, the purchase of which was negotiated between Southland, as Bay's distributor or dealer, and W. D. Johnson, as Southard's Secretary-Treasurer. In the final analysis though, the following statements and agreements would control the transaction in question:

The brochure published by Oakland Airmotive on May 30, 1960, and subsequently adopted by Bay, which lists a standard Super-V as including the conversion itself, matching paint and FAA certification; the distributor agreement of August 10, 1960, entered into between Bay and Southland by which Southland, as compensation for its activities as Bay's dealer or distributor, was to receive a $3,000.00 profit on each order for a Super-V standard conversion; information related to Southland from Bay as to the unavailability of fuel injection and the change from A1A to A1C engines prior to the execution of Southard's purchase order; the entries upon and provisions of the purchase order itself executed by Southland and Southard on September 16, 1960, which orders a standard conversion, super soundproofing, return of Southard's propeller, and which states in effect that Southland is Southard's agent for purposes of negotiating the order and securing compliance by the manufacturer, Bay, in filling the order and conforming to the warranties contained therein; the agreement to add hyper wing-tips and a partial interior job; and agreements made subsequent to the delivery of the aircraft by Bay to Southland to repaint the plane and repair its radio, repair defects and de-

ficiencies in the conversion proper, and to reduce the invoice price to Southland by $3,000.00 to the amount of $17,601.50 to cover the loss of the propeller, failure to install fuel injection, fuel filters and oil breather systems, and the failure to remedy all other defects and deficiencies.

The rule governing ·compensation of a bailee is stated in 8 C.J.S. Bailments § 33, as follows:

"Bailment for mutual benefit. Whether or not the bailee is entitled to compensation, or how much compensation he is entitled to, depends on the terms of the contract, and especially on the purpose of the bailment. Unless it is expressly agreed, or can be inferred from the circumstances, that services performed by the bailee in connection with the bailment were to be rendered without compensation, the law will imply a promise on the part of him for whom the services were rendered to pay for them what they are reasonably worth. Thus, where the bailment is for mutual benefit, the bailee is entitled to compensation for the work performed by him.

"As a general rule, where the contract is an entire one, the bailee is entitled to compensation only where there has been full performance, and where no time for payment is specified the bailee is entitled to compensation on the completion of the work he agreed to do, payment and redelivery being contemporaneous obligations. * * *

"The bailee may be precluded from recovering compensation where his negligence caused damage to, or loss of, the property, or the goods he manufactured from the materials furnished by the bailor were defective, or where by deviation from his instructions the bailee has made his work of no use.· Where the bailee has breached his contract as to part of the goods bailed, he is entitled to recover compensation only for

work on that part of the goods as to which he performed his contract.

\*　\*　\*　\*　\*　\*

"Acceptance by bailor. A bailor has the right to accept goods on which work was performed by the bailee although he knows that such work was negligently performed and the acceptance does not create a liability for the contract price for such work. A refusal of a tender of the work by the bailor entitles the bailee to compensation irrespective of whether the bailee left the goods on the bailor's premises or took them back with him."

The burden upon Bay as bailee in the present case is stated in 8 C.J.S. Bailments § 50, at page 514, as follows:

"A bailee suing his bailor to recover for work done by the bailee must prove performance of the work and return of the property."

Therefore the court must concern itself with the performance by Bay on the contract to convert Southard's aircraft before determining the compensation due Bay as the bailee for hire. This question will be governed mainly by the purchase order executed on September 16, 1960, and any oral agreements entered into or statements made contemporaneously with its execution. As for the conversion job itself, Southard ordered a standard conversion plus super-soundproofing, hyper wing-tips, and certain interior work, but on the invoice dated April 7, 1961, it was billed only for the retail price of the standard conversion plus the cost of extra work on the airframe in preparation for the conversion. As heretofore stated, the total cost of this work to Bay amounted to $28,700.00, but Southard, as purchaser, was charged $22,476.00, of which $17,601.50 has been paid to Southland, and Southland, as distributor, on its invoice of the same date was charged only $20,601.50, which amount has been further reduced by $3,000.00 as compensation for Bay's failure to fully complete the conversion and for certain defects

and deficiencies that had been acknowledged by all parties. On the negative side, Southard's propeller, worth $750.00, was misplaced by Bay, the paint was not matched properly, the exhaust stacks and airscoops cracked after only a few hours in flight, the radio had not been repaired, and an extra compass and oxygen bottle were missing, and parts of the interior of the cabin were either defective or missing. Since the date of delivery of the aircraft it has been completely repainted by Southland in a satisfactory manner, the radio has been repaired, and the exhaust stacks and airscoops have been replaced, all at the expense of Bay, pursuant to agreements among the parties.

In spite of these efforts of compliance on the part of Bay, Southard, as represented by Johnson, has refused to take delivery of the aircraft from Southland because of a starting problem which can be remedied for less than $200.00. Furthermore, Southard insists that the design and engineering of the exhaust stacks and airscoops on the A1C engines are inherently defective, yet six other Super-V aircraft with the same type of engine have also been certified by the FAA as airworthy and have been flown collectively for several hundred hours, there being only one complaint of cracked exhaust stacks which have since been satisfactorily replaced. The replacement of A1A by A1C engines in the Super-V was known to Southland prior to the execution of the purchase order, as well as was known the unavailability of fuel injection in either type of engine. Since it is elementary that notice to an agent is notice to a principal, and for the purposes of this purchase order Southland was the agent of Southard to the extent of negotiating this particular purchase and delivery of Southard's aircraft, Southard is charged with notice of the change in engine design and unavailability of fuel injection. The delay in obtaining FAA certification for the A1C engine was unforeseen, and the purchase order provided for such delay on the part of the manufacturer. At any rate,

the A1C engine, which was superior to the A1A in performance and in carburetion design, cost $900.00 each more than the A1A, and this cost was not charged to Southland or to Southard on their invoices. Fuel injection was not promised by Bay at any time, either by the brochure dated May 30, 1960, or by its dealer or distributor, Southland, at any time prior to the execution of the purchase order. Although Southard is dissatisfied with the use of fiberglass engine cowlings, this type cowling was specified in Bay's brochure and is not defective as used on the aircraft in question. As a matter of fact, fiberglass engine cowlings have been in common usage in the aircraft industry for the past ten years. Southard is not satisfied with the interior finish of its aircraft, but Bay had agreed to refinish the seat cushions, head liner, and floor mat only at an unspecified cost over and above the standard conversion requirements, and the cost of this work was not billed on either of the invoices. The defects of the other parts of the interior can be remedied at a nominal cost. Although Bay has not supplied Southland with a fuel-filtering system and an adequate oil breather system to be installed on Southard's aircraft as it promised subsequent to the delivery of the aircraft, the cost of doing so would amount to less than $300.00. Since Southard has refused to allow Southland to release the aircraft to Bay for completion of the conversion and the repair of any remaining defects or deficiencies, and since Bay refused to do this additional work on the aircraft at Southland's hangar, Bay in its negotiations with Southland and Southard agreed to reduce the invoice amount to Southland by $3,000.00, to the amount of $17,601.50, to compensate for the cost of completing the conversion, remedy of defects and deficiencies and replacement of missing items, the value of which amounts to approximately $1,200.00 to $1,500.00, as well as for the failure to install fuel injection as it had subsequently promised after the aircraft had been delivered to Southland on April 15, 1961.

■ Therefore, granted that under the rule stated above, Bay has not fully performed its contract to convert Southard's aircraft to a Super-V, nor has it remedied all of the defects and deficiencies that it agreed to do subsequent to delivery of the aircraft to Southland, yet the fact remains that Bay has spent $28,700.00 to complete a job for which it now asks payment in the sum of $17,601.50. This court is of the opinion that Bay, as a bailee for hire, has sustained its burden of showing full performance of its contract to convert Southard's airplane to a standard Super-V and the return of the bailed aircraft to the owner to the extent of its claim of $17,601.50 as the amount due for the work performed, less the amount of $750.00 which is due Southland for repainting Southard's aircraft, which job it undertook at Bay's expense and at its request at the time the aircraft was delivered on April 15, 1961.

The next major issue as presented by Southard's counterclaim for damages is whether Bay is liable for the purchase price of the lost propeller, the cost of Southard's estimation of completing the job and to repair defective work, the loss of use of the aircraft, and the loss of the services and costs of travel of W. D. Johnson, its Secretary-Treasurer.

■ The degree of care owed by a bailee is stated in 8 C.J.S. Bailments § 30, as follows:

"Where the nature of the bailment is such that duties or services are to be performed by the bailee, it is his duty to exercise diligence in the performance of such duties and services, and a right of action accrues to the bailor where the services to be performed by the bailee have not been sufficiently performed.

"The bailee must pursue any instructions given, expressly or impliedly, with relation to the subject matter of the bailment or he will be liable in the event of loss or injury resulting from a nonperformance. A contract provision excusing non-performance by the bailee is to be given a reasonable construction.

\* \* \* \* \* \*

"In a bailment of mutual benefit for the repair of the article bailed the bailee impliedly agrees to use ordinary care in the performance of the services he expressly agrees to do with relation to the thing bailed, and ordinary care would require the bailee to use such skill and care in performing the services as the ordinary skillful worker in his particular line of business would use in doing like work.

"Where skill as well as care is required in performing the undertaking, if the bailee purports to have skill in the business he must be understood to have engaged to use a degree of skill adequate to the due performance of his undertaking."

■ The liability of a plaintiff-bailee to a counterclaim by a bailor is stated in 8 C.J.S. Bailments § 33, page 433, as follows:

"The bailee's right to compensation is subject to a counterclaim by the bailor to the extent of any loss of, or injury to, the property caused by the fault of the bailee."

■ The first two claims of Southard, i. e., market price of lost propeller and its estimation of cost of completion and repair of its Super-V constitute an allegation of general damages proximately resulting from faulty work. The general rule is stated in 8 C.J.S. Bailments § 55(2) e, at page 568, as follows:

"Where an article is intrusted to a bailee for alterations or repairs and, by reason of deviation from the bailor's instructions, of negligence, or of unskillfulness, the work is not properly performed, the bailor may sue for the breach of contract to repair, in which case the measure of his damages is the difference in the value of the article in its present condition and what it would have been worth if the work had been properly performed."

See, Arkansas Machine & Boiler Works v. Moorhead, (1918), 136 Ark. 18, 205 S.W. 980, 1 A.L.R. 1652.

As for the loss of the propeller, the market value has been fixed at approximately $750.00, and this amount has been compensated for by the $3,000.-00 reduction by Bay of its invoice price to Southland. As for the cost of completing the contract for conversion and for the repair of defective work, Southard has estimated a figure of $25,000.00. The bulk of this figure is derived from the estimation of engineering costs which Southard alleges are necessary to correct inherently faulty design and operation of the Super-V, exhaust stacks, airscoops and oil breathing systems as used on the A1C engines. As heretofore stated, the design and engineering of the above systems have been approved by the FAA and are currently utilized by other operational Super-V conversions powered by A1C-type engines, and the full cost of remedying the remaining defects and deficiencies as well as replacing all lost items which have been itemized above has been fully compensated by Bay's reduction by $3,000.00 of the amount owed it by Southland on the invoice dated April 7, 1961.

The remaining allegations of Southard concerning the loss of use of the aircraft and the loss of services of Johnson, as well as the cost of his travels to Southard, come under the heading of special damages as originally contemplated by the landmark English case of Hadley v. Baxendale, 9 Exch. 341. Justice Riddick of the Arkansas Supreme Court restated the Hadley v. Baxendale rule with respect to Arkansas law on special damages in the case of Hooks Smelting Co. v. Planters' Compress Co. (1904), 72 Ark. 275, 79 S.W. 1052, at page 1056, beginning at page 286 of 72 Ark. as follows:

"Now, where the damages arise from special circumstances, and are so large as to be out of proportion to the consideration agreed to be paid for the services to be rendered under the contract, it raises a doubt at once as to whether the party would have assented to such a liability had it been called to his attention at the making of the contract unless the consideration to be paid was also raised so as to correspond in some respect to the liability assumed. To make him liable for the special damages in such a case, there must not only be knowledge of the special circumstances, but such knowledge 'must be brought home to the party sought to be charged under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it.' In other words, [where there is no express contract to pay such special damages], the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more that ordinary damages in case of default on his part. Wills, J., in British Columbia Sawmill Co. v. Nettleship, L.R. 3 C.P. 235; Globe Refining Co. v. Landa Oil Co., 190 U.S. 540, 23 Sup.Ct. 754, 47 L.Ed. 1171; McKinnon v. McEwan, 48 Mich. 106, 11 N.W. 828; Snell v. Cottingham, 72 Ill. 161; Horne v. Midland R. Co., L.R. 8 C.P. 131; Booth v. [Spuyten Duyvil Rolling] Mill Co., 60 N.Y. 487; Wood's Mayne on Damages (1st Am.Ed.), p. 50; 1 Sutherland on Damages, § 52, p. 110; 8 Am. & Eng.Enc.Law (2d Ed.), 593."

See, also, Lamkins v. International Harvester Co. (1944), 207 Ark. 637, 182 S.W. 2d 203; and Pine Bluff Wire Iron Works v. Boling (1905), 75 Ark. 469, 88 S.W. 306.

In the present case there were no such provisions in the contracts and agreements among the parties at the time the aircraft was delivered to Bay, nor was there any notice to Bay of the likelihood

of special damages resulting on the part of Southard if the completion of its Super-V conversion were to be delayed for any reason.

Even if such notice had been given to Bay, the purchase order provided that Bay was not to be liable for delays due to unforeseen circumstances as enumerated that would be beyond its control and, as stated in the purchase order, this written provision would prevail. As for the loss of use of the aircraft after its delivery to Southland, it must be pointed out that Southard, acting through Johnson, has steadfastly refused permission to Southland to release it to Bay so that any of its defects and deficiencies could be remedied. Thus, Southard is in no position to collect for the loss of use of its aircraft in any case because it is bound by the provisions in the purchase order, and because it has breached its duty to minimize damages by its own actions which have prevented Bay from fully performing its contracts and agreements.

As for the liability of Bay for the loss of services of Johnson and the cost of his trip to California to take delivery of the aircraft on April 15, 1961, and his subsequent trips to Hope, Arkansas, even if special notice had been given to Bay of the likelihood of these costs due to its delay in completion of the Super-V conversion, yet it is to be noted that the relationship of Johnson with Bay and Southland in this transaction was less than one at arm's length. As a matter of fact, Johnson, besides carrying on his duties on behalf of Southard, was anticipating joining the budding Super-V program as a salesman, and the discount on the purchase price of his Super-V given by Southland and the extra work done on the aircraft by Bay, billed to him at less than manufacturer's cost, are clear indications that Johnson was an "insider" insofar as the Super-V program was concerned, rather than a casual purchaser only.

This relationship is evidenced by a letter written by Johnson on May 8, 1961, which he addressed to Bay for the attention of Mr. Gough, one of its officers, in which he stated as follows:

"Since my telephone conversation with you there has been some slight modifications in our thoughts for the future of the Super V. Our business has not been entirely with you or the Bay Aviation Company but directly with the Southland Aviation whom we consider a very responsible organization. While we enjoyed our connection with Mr. Bellamy before he was killed but our direct connection has been with the Southland Aviation.

\*    \*    \*    \*    \*    \*

"We would have never had this plane converted had it not been for the purpose of working with Mr. Bellamy and Bay Aviation in the sale of Super V Aircraft and you know very well there has been no opportunity to sell any for the last nine months, this is not our fault.

"I think the things you told me are a step in the right direction and am hopeful to learn more about the operation in San Antonio as well as the rest of the places.

"To lose eight months in sales of Super V is bad enough but along with it the loss of eight months use of the plane in our own business. I hope you instruct Southland Aviation to get our plane in shape as I feel we have been most patient. We are interested in seeing the Super V, go because we believe it can go and we have given you some facts that are MUST. Please send us financial statements of both Bay Aviation and Oakland Airmotive Company."

Aside from this relationship, Johnson, as a self-styled expert on aeronautics in general and the Super-V in particular, should have been aware of the fact that the Super-V program was still in the pioneering stage at the most when he purchased a standard conversion for Southard's aircraft in September 1960, and he also should have been aware of

the probability of unforeseen defects in the routine production of such a conversion and the appearance of certain shortcomings in the finished product, which only time and experience could remedy.

Therefore, it is the conclusion of the court that Southard is in no position to collect special damages from Bay since there was no notice to Bay, and since its Secretary-Treasurer, Johnson, had been desirous to devote a large portion of his services and the use of Southard's aircraft in promotion and furtherance of the sales program without thought of direct recompense from the time that Oakland Airmotive purchased the Super-V design from David Peterson in 1958. Under the provisions of the distributor agreement between Bay and Southland and of the purchase order executed between Southland and Southard, Johnson, as a representative of Southard, was not expected to fly to California to take delivery nor did he have the right to delay or impede the completion of the Super-V conversion by making excessive demands on Bay and by refusing to allow Bay to minimize any damages by completing the conversion at its plant in California.

The only remaining issue concerns Southland's counterclaim for interpleader whereby Southland asks for an award of $750.00 for painting the aircraft and $340.00 for storing the same since September 1961. As the court has heretofore stated, Southland is entitled to the sum of $750.00 for repainting the aircraft, which sum is to be paid by Bay since it undertook this job on specific orders of Bay separate from any of the other contracts or agreements entered into by the parties.

As for the cost of storing the aircraft in question from September 1961, this cost should be borne by Southard since Johnson insisted that the aircraft remain at Southland's hangar and not be returned to Bay for completion of the Super-V conversion and repair of any defects or deficiencies that were present.

CONCLUSIONS OF LAW

1.

The court has jurisdiction of the parties to and the subject matter of this cause of action.

2.

Lawrence Properties Company, as the successor of Bay Aviation Services Co., is entitled to $16,851.50, as compensation for its installation of the Super-V standard conversion upon Southard Production Company's aircraft pursuant to a purchase order dated September 16, 1960, which sum is to be paid by the Clerk of the Court out of the funds heretofore deposited in the registry of the court by Southland Aviation, Inc.

3.

Southland Aviation, Inc., is entitled to the sum of $750.00 for repainting the aircraft which is to be paid by the Clerk of the Court out of the funds in the registry of the court.

4.

Southland Aviation, Inc., is entitled to recover of and from the Southard Production Co. the sum of $340.00 for storing of the aircraft since September 1961. Upon the payment by Southard Production Co. to Southland Aviation, Inc., of the $340.00, with interest thereon from this date at the rate of 6 percent per annum, Southard Production Co is entitled to possession of the said aircraft at its place of storage in Hope, Arkansas.

5.

The counterclaim of Southard Production Co. against Bay Aviation Services, Inc., and its successor, Lawrence Properties Co., should be dismissed.

6.

The Southland Aviation, Inc., is not entitled to recover any attorneys' fees.

7.

Lawrence Properties Co., as successor to Bay Aviation Services Co., and South-

144

land Aviation, Inc., shall recover of and from the Southard Production Co. all costs laid out and expended herein.

A judgment in accordance with the above is being entered today.