The CITY NATIONAL BANK OF FORT SMITH, ARKANSAS, a national banking association, Plaintiff,

v.

Ilo VANDERBOOM, Platte, South Dakota, Defendant.

The CITY NATIONAL BANK OF FORT SMITH, ARKANSAS, a national banking association, Plaintiff,

v.

DeHAAN LIVESTOCK AND GRAIN FARMS, INC., a South Dakota Corporation (Andrew DeHaan, Platte, South Dakota, Registered Agent), Andy D. DeHaan, Kenneth J. DeHaan (Both Platte, South Dakota) and Lyle R. DeHaan, Geddis, South Dakota, Defendants.

The CITY NATIONAL BANK OF FORT SMITH, ARKANSAS, a national banking association, Plaintiff,

v.

H. T. RINGLING, Platte, South Dakota, Defendant.

The CITY NATIONAL BANK OF FORT SMITH, ARKANSAS, a national banking association, Plaintiff,

v.

James NACHTIGAL, Academy, South Dakota, Defendant.

The CITY NATIONAL BANK OF FORT SMITH, ARKANSAS, a national banking association, Plaintiff,

v.

Robert CARTER, Platte, South Dakota, Defendant.

Civ. A. Nos. 2103–2107.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Sept. 27, 1968.

Thomas Harper, of Harper, Young, Durden & Smith, Fort Smith, Ark., for plaintiff.

William M. Stocks, of Bethell, Stocks, Callaway & King, Fort Smith, Ark., for defendants.

## OPINION

JOHN E. MILLER, Senior District Judge.

A motion for summary judgment was filed by the plaintiff in each of these cases on August 5, 1968. Prior to the filing of the motion, the plaintiff had filed a motion for summary judgment in each of the cases on April 8, 1968. The court considered the earlier motion, and submitted to counsel a letter opinion, and an order was entered overruling the motion on May 15, 1968. (Counsel for plaintiff have requested that the earlier motion be again considered in connection with the present motion of August 5, 1968.)

The complaint in each of the following cases was filed November 11, 1967.

In Civil Action 2103 the plaintiff is seeking judgment for $20,555.64 with interest from May 30, 1967.

In Civil Action 2104 the plaintiff is seeking judgment for $70,000 with interest from June 1, 1967.

In Civil Action 2105 the plaintiff is seeking judgment for $44,444.44 with interest from May 30, 1967.

In Civil Action 2106 the plaintiff is seeking judgment for $45,833.34 with interest from May 30, 1967.

In Civil Action 2107 the plaintiff is seeking judgment for $32,222.22 with interest from May 30, 1967.

Subsequent to the commencement of Civil Actions 2103–2107 the plaintiff on November 16, 1967, filed a complaint (Civil Action 2108) against these same defendants and others to enjoin and restrain said parties from proceeding with Case No. 67–871 filed by them in the Circuit Court, Second Judicial Circuit, County of Minnehaha, State of South Dakota, against the plaintiff. The court, after a full hearing in Civil 2108, issued a preliminary injunction enjoining the parties from prosecuting said suit in the state court of South Dakota. Later the plaintiffs in the South Dakota case dismissed their complaint, and on March 13, 1968, the defendants in the instant case filed their separate answers and counterclaims, in which they each admitted the execution of the notes, the receipt of the money from plaintiff, the payments made thereon by them, and extensions granted by plaintiff, but denied that they were liable for the reasons set forth in their counterclaims. In the counterclaim, the defendants alleged:

"The defendant and counter-claimant states that for sometime prior to, at the time of, and subsequent to the execution of the note, one James S. Hall, was a vice president and agent of the plaintiff and that Hall, in conjunction with others, worked out a scheme or method of fraudulent misrepresentations whereby this defendant and counter-claimant and others would use personal funds and funds obtained from the plaintiff for the ultimate purchase of all of the stock in an Arkansas corporation called American Home Builders, Inc., which was represented by Hall and others to this defendant and counter-claimant and others to be a well-managed, solvent corporation, when in fact at the time of these misrepresentations and at the time of the execution of the note in question and subsequent thereto American Home Builders was in fact insolvent. At all times herein mentioned, Hall owned approximately one-third of the stock in American Home Builders and fraudulently induced this defendant and counter-claimant and others to obtain the loan by the execution of the note in question, all in violation of 12 U.S.C.A., Section 375 A, and 18 U.S.C.A., Section 220, and the rules and regulations thereunder pertaining to national banks, while an officer and agent of the plaintiff, and further the plaintiff at all times herein mentioned did not follow normal banking practices and knew or should have known that by advancing the money under the note in question, it was participating in the scheme whereby this defendant and others would purchase an insolvent corporation with the proceeds of the note and other personal money, all to the detriment of this defendant and counter-claimant, and to the financial benefit and gain of its officer and agent and itself, all in violation of the U. S. Code sections hereinabove referred to and further in violation of the common law."

On April 5, 1968, the plaintiff filed its reply to the counterclaims, in which it alleged:

"1. The defendant's purported counterclaim appears to be set out in Paragraph 7 thereof, and the plaintiff denies each and every allegation made and attempted to be made in said paragraph, and denies that defendant is entitled to the relief prayed against plaintiff therein.

"2. Further answering, plaintiff alleges that by defendant's admission of making payments on the note de-

scribed in the complaint, defendant waived his right to assert his alleged counterclaim, and is now estopped from doing so.

"3. Further answering, plaintiff alleges it is a holder in due course of the note described in the complaint, and as such holds same free from the claim sought to be asserted by defendant in the counterclaim.

"4. Further answering, plaintiff states that said counterclaim fails to state a claim upon which relief can be granted.

"WHEREFORE, without waiving the foregoing motion, plaintiff prays that the counterclaim herein be dismissed and that plaintiff have the relief first prayed in its complaint against the defendant."

Following the filing of the reply to the counterclaim, the defendants decided to obtain other counsel and employed their present counsel, who filed motions for extensions of time to familiarize himself with the issues, which extensions were granted. Then began the filing of a series of interrogatories which will later be considered along with all other documents in support of the motion for summary judgment.

On August 13, 1968, the defendants, after obtaining leave of court, filed an amended counterclaim, which supplements and enlarges the allegations contained in the original counterclaim. On August 20, 1968, plaintiff filed its reply to the amended counterclaim.

In the motion for summary judgment now before the court in Civil Actions 2103–2107, the plaintiff alleged:

"I.

"The complaints, answers, counterclaims and replies thereto in each of said causes of action, and the affidavits, depositions and certificates and exhibits thereto, all of which are attached hereto, show that there is no genuine issue as to any material fact, either as to the complaints or as to the counter-claims in each of said causes,

and that plaintiff, as a matter of law, is entitled to declaratory judgments as prayed in the complaints against the defendants in each of Causes Nos. 2103, 2104, 2105, 2106, 2107 and 2108, and to judgments dismissing the counterclaims in each and all of said causes.

"II.

"In support of this motion, plaintiff attaches hereto the following documents as Exhibits identified as set out below, each of which is made a part hereof:

Exhibit 1—Affidavit of Austin Gatlin.

Exhibit 2—Affidavit of Sam Sexton, Jr.

Exhibit 3—Copy of discovery deposition taken by defendants of Austin Gatlin.

Exhibit 4—Copy of discovery deposition taken by defendants of Sam Sexton, Jr.

Exhibit 5—Copy of discovery deposition taken by defendants of James S. Hall.

Exhibits 6 to 12—Copies of interrogatories served upon and verified answers thereto served by each of the defendants in each of the above causes.

Exhibit 13—Copy of interrogatories served upon and verified answers thereto served by plaintiff's president, Edward H. Smoot.

Exhibit 14—Copy of verified complaint filed and served by these defendants herein as plaintiffs in Cause No. FS–68–C–27 in this court on July 19, 1968.

"III.

"Incorporated herein by reference are other pleadings filed herein by de-

fendants with motions for leave to file same:

Exhibit 15 (by reference)—Third-Party Complaint.

Exhibits 16 to 20 (by reference)—Amended Counterclaims in causes 2103, 2104, 2105, 2106, and 2107.

"WHEREFORE, plaintiff prays for summary judgment granting the relief above described in each of said causes, and that the court fix a time and place for hearing same, not sooner than ten days after service hereof."

In the response of defendants to the motion, each of them alleged:

"1. The plaintiff is not entitled to a declaratory judgment upon the complaint filed against each of the defendants, and the plaintiff is not entitled to a summary judgment against the defendants-counterclaimants on their respective counterclaims filed in Civil Actions Nos. 2103, 2104, 2105, 2106, and 2107.

"2. Genuine issues of material facts exist between the counterclaimants and the plaintiff and as a matter of law, the plaintiff is not entitled to a summary judgment against any one of the counterclaimants in the referenced causes.

"3. In support of each defendant and counterclaimant's opposition to the motion for summary judgment, the defendants and counterclaimants attach hereto the following documents and exhibits identified as set out below, each of which is made a part hereof:

Exhibit 1—Affidavit of Maurice W. Markham, Jr., with further exhibits attached.

Exhibit 2—Summary of deposition of Austin Gatlin.

Exhibit 3—Summary of deposition of James S. Hall.

Exhibit 4—Summary of deposition of Sam Sexton, Jr.

Exhibit 5—Affidavit of Ilo Vanderboom.

Exhibit 6—Affidavit of Andy DeHaan.

Exhibit 7—Affidavit of James Nachtigal.

Exhibit 8—Affidavit of H. T. Ringling.

Exhibit 9—Affidavit of Robert Carter.

"4. Incorporated herein by reference are the following:

Copies of interrogatories served upon and verified answers thereto served by each of the defendants and counterclaimants in each of the above causes.

Copies of interrogatories served upon and verified answers thereto served by plaintiff's president, Edward H. Smoot.

The counterclaims as amended of each of the defendants and counterclaimants in each of the above causes.

"WHEREFORE, defendants and counterclaimants pray that the motion for a declaratory judgment on the complaint and the motions for summary judgment against each of the defendants and counterclaimants on their counterclaims filed herein be denied and for all other proper relief."

There is complete diversity of citizenship between the plaintiff and all the defendants. The amount involved in each suit exceeds the sum of $10,000, exclusive of interest and costs, and thus the court has jurisdiction.

The court has heretofore referred to the first motion for summary judgment filed by plaintiff on April 8, 1968, and to the incorporation by reference of that motion in the brief of plaintiff.

In the motion of April 8, 1968, the plaintiff alleged that the pleadings showed that there is no genuine issue as to any material fact, and that plaintiff is entitled to a summary judgment as prayed in cases Nos. 2103–2107.

In support of the motion plaintiff in its brief, inter alia, stated that each defendant had admitted the execution of the notes, the payments, renewals and extensions thereof, and that the balance due the plaintiff as alleged is correct; that the defendants received the proceeds of the loans; that the notes were executed for value. The plaintiff argued that it was a holder in due course of each note; that the nebulous allegations of the counterclaims do not affect the rights of plaintiff; that a principal is not charged with knowledge of an agent who may have engaged in a fraudulent enterprise and that any knowledge of Hall is not imputable to plaintiff. None of the proceeds of the notes went to the bank in any manner; that the defendants, by their conduct, have waived any claim against plaintiff; and that they are now estopped from asserting the defense as set forth in the counterclaims; that when the notes were renewed and extensions received, the defendants had knowledge of all facts relative to the loans, and notwithstanding that knowledge made partial payments and months afterwards renewed the notes and received extensions, and are therefore estopped from now contending that the bank was guilty of any fraud in making the loans.[1]

At that time the defendants were represented by counsel other than their present counsel, and in the brief in opposition to the motion, counsel stated:

"It is defendant's position that the plaintiff is not a 'holder in due course' with respect to the notes in question due to the fact that it did not take the notes 'in good faith * * * without notice of any defense.'"

In discussing the knowledge of the bank which defendants contend was imputed because of the interest of one of its officers in the corporations which defendants bought, counsel stated:

"Assuming that the knowledge is imputed, and in view of the benefit to the bank through the perpetuation of a good customer, and the benefit to the bank officer through the relief from the guarantee of the Texas Capital note, all of which are alleged in the counterclaim in the third party complaint, the bank becomes a party to the fraud alleged in the pleadings. The bank could not then be a holder in due course with respect to the notes which it received in this tainted transaction."

The court denied the first motion of defendants, and in the letter opinion of May 15, 1968, addressed to the attorneys and filed in the Clerk's office, the court, inter alia, stated:

"Each defendant has admitted the execution of the note or notes sued upon and that he has received the proceeds derived from the loan made to him. Each defendant has made payments, and there is no dispute about the correctness of the amount remaining due on each note. Neither is there any dispute about each defendant being in default.

"The sum and substance of the claim of each defendant is that an official of the bank, the then Vice President, together with certain unidentified associates, falsely represented to the defendants the financial condition of the various corporations, the capital stock of which the defendants purchased with the proceeds of the loans.

\* \* \* \* \* \*

"None of the pleadings sets forth any dates except the dates of the notes and the payments and extensions received by each defendant. The date of

---

1. In support of the contentions thus made, the plaintiff cited Ark.Stat.Ann., §§ 85–3–302 and 85–3–305, defining a holder in due course; Poch v. Taylor (1932), 186 Ark. 700, 55 S.W.2d 74; Great American Indemnity Co. v. First National Bank (10 Cir. 1938); 100 F.2d 763; Anderson v. General American Life Ins. Co. (6 Cir. 1944), 141 F.2d 898; Schram v. Burt (6 Cir. 1940), 111 F.2d 557, in which the court at page 564 quoted from Farmers' & Merchants' National Bank of Fremont, Neb. v. Smith, 8 Cir., 77 F. 129; Sebastian County Bank v. Gann (1915), 121 Ark. 115, 180 S.W. 754, on waiver of defense of fraud; and Harrington v. Citizens' Investment & Security Co. (1923), 160 Ark. 320, 245 S.W. 831.

the purchase of the alleged insolvent corporations is not stated, and there is nothing to guide the court, in the pleadings, as to what the status of the entire transaction was when the payments were made and the extensions granted.

"In my opinion, the burden is upon the defendants to show notice to the bank of the alleged fraudulent scheme at the time the notes were executed. The mere fact that Hall was a Vice President of the bank is not sufficient unless the proof goes further to meet the requirements of the law and to give notice to the official of the bank who made the loans. If defendants meet that, then in all probability the burden of proof would shift to the plaintiff to show that when the payments were made and extensions obtained, the defendants at that time knew or should have known of the defenses that are now alleged against the notes."

The plaintiff now contends that the present motion is supported by affidavits, depositions, pleadings, interrogatories and answers thereto, and that these documents conclusively establish the defense of waiver and estoppel pleaded by plaintiff as a complete defense to each counterclaim.

The defendants contend that they were defrauded by the individuals with whom they dealt in buying the capital stock in various corporations; that the plaintiff aided said individuals in the perpetuation of the alleged fraud and that the plaintiff is liable to them; and that "an issue of fact is clearly presented as to whether or not Mr. Smoot or other officers of the City National Bank made overt misrepresentations of the soundness of American Home Builders, Inc., and Peoples Loan & Investment Company to each of the defendants and counterclaimants. While the defendants and counterclaimants did not purchase the stock in issue from the City National Bank, this is no requirement for their recovery under Rule 10b–5 of the Secur-

ities and Exchange Commission and the decisions of the courts thereunder."

Rule 56(c), Fed.R.Civ.P., provides:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Subsection (e) of the rule provides:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

In Poller v. Columbia Broadcasting System (1962), 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458, the court at page 488 of 82 S.Ct. said:

"Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case 'show that [except as to the amount of damages] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Rule 56(c), Fed.Rules Civ.Proc., 28 U.S.C.A. This rule authorizes summary judgment 'only where the moving

party is entitled to judgment as a matter of law, where it is quite clear what the truth is, * * * [and where] no genuine issue remains for trial * * * [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.' Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944)."

In Chicago Great Western Ry. Co. v. Casura (8 Cir. 1956), 234 F.2d 441, the court at page 447 said:

"If * * * reasonable minds might reach different conclusions, then the case presented fact issues to be submitted to the jury and not questions of law to be determined by the court. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Wellshear v. Brown, 8 Cir., 231 F.2d 612; Chicago Great Western Ry. Co. v. Scovel, 8 Cir., 232 F.2d 952." ·

In Chambers v. United States (8 Cir. 1966), 357 F.2d 224, the court at page 227 said:

"We have consistently held that summary judgment is appropriate where, had the case gone to trial, a directed verdict would have been required. Wolf v. Schaben, 272 F.2d 737 (8th Cir. 1959); Rubenstein v. Dr. Pepper Co., 228 F.2d 528, 532–533 (8th Cir. 1955); Durasteel Co. v. Great Lakes Steel Corp., 205 F.2d 438, 441 (8th Cir. 1953).

*    *    *    *    *    *

"The purpose of our summary judgment rule is to expeditiously determine cases without necessity for formal trial where there is no substantial issue of fact and is in the nature of an inquiry to determine whether genuine issues of fact exist. If no factual dispute exists and the complaint does not state a cause of action, it should be disposed of by summary judgment rather than exposing the litigants to unnecessary delay, work and expense in going to trial when the trial judge would be bound to direct a verdict in movant's favor after all evidence is adduced."

In 6 Moore's Federal Practice, 2d Ed., ¶ 56.04 [2], at page 2066, the learned author said:

"In accordance with the theory of a directed verdict, all inferences of fact from the proffered proofs must be drawn against the movant and in favor of the party opposing the motion. And, also in accord with the theory of a directed verdict, a court should not grant summary judgment, where it could not properly direct a verdict, although it might properly set a verdict aside as against the weight of the evidence."

In the consideration of the record and in determining whether there exists any genuine issue as to material fact, the court is of the opinion that the status of the chief witness of the defendants, M. W. Markham, should be determined.

In the suit that was filed by the present defendants and others in the state court in South Dakota, notice of which was given November 6, 1967, against the plaintiff bank, Austin Gatlin, James S. Hall, Sam Sexton, Jr., and Charles H. Smith, it was alleged in paragraph 3.3 of the complaint that Markham, "acting at the instance of said defendants, * * * made frequent trips from Arkansas to South Dakota by airplane where he was instrumental in causing the plaintiffs and others to subscribe money for loans and for the purchase of stock in Investors Thrift Corporation, so that by September 9, 1965, he was enabled on behalf of Investors Thrift Corporation to make the down payment on a Purchase Agreement for the purchase of 100 percent of the issued and outstanding stock of said American Home Builders, Inc."

In paragraph 9, page 3, of the amended counterclaim filed in Civil 2103, it is alleged that the defendant-counterclaimant Ilo Vanderboom authorized Markham to enter into a contract to purchase the stock of American Home Builders, Inc. (The counterclaim in each case is substantially similar to all the others.)

Other allegations are reflected in the complaint which establish without doubt

that the present defendants at the time they filed the suit in the state court in South Dakota were claiming that Markham was the agent of the plaintiff bank and that it was he who represented the bank in the entire transaction. For instance, in paragraph 4.3, page 10, of that complaint, it is alleged that Markham was the emissary and agent of the bank and other individuals, and that "Markham personally conducted a large and substantial part of the negotiations for the sale of said securities for the defendants within the State of South Dakota."

In the affidavit of Markham, page 6, he stated:

"In the September 9th contract, Austin Gatlin had provided himself a salary from Peoples Loan for management services commencing September 19, 1965. After the September contract, I was busy raising additional money necessary to complete the pay off to Texas Capital Corporation. Huey Smith continued as President of American Home Builders, Inc., until about the first of December 1965. Austin Gatlin and Sam Sexton controlled Peoples Loan and Investment Company until November 5, 1965 [Nov. 2, 1965] and after Mr. Sexton left, Mr. Gatlin ran the Peoples Loan and Investment Company, while I continued to raise the additional funds required to complete the pay off to Texas Capital Corporation."

Beginning on page 12 of his affidavit, Markham stated that after the exercise of the option, Gatlin began to complain about not receiving 50,000 shares of stock in Investors Thrift Corporation.

"He threatened to quit and sue Peoples Loan and Investment Company, Investors Thrift Corporation and me to get the 50,000 shares of stock. Jimmy Willis and I bought his right to the 50,000 shares of Investors Thrift Corporation stock for $50,000. Markham Homes, Inc., Willis and I individually executed a $50,000 note to Gatlin on November 17, 1965, which has been paid."

Markham further stated:

"After the execution of the note, Mr. Gatlin promised to remain and work for Peoples Loan and Investment Company as originally agreed. Instead of doing this, he commenced to undermine me with the South Dakota investors, which failed. He then attempted to get a management contract from the directors of Peoples Loan and Investment Company, but was unsuccessful. Because of these maneuvers, I had to ask Mr. Gatlin to leave and began to manage Peoples Loan and Investment Company myself, which I never had any intention of doing prior to this time."

The indisputable fact is that Markham was the agent and representative of the defendants in all negotiations between defendants and Hall, Sexton and Smith.

The witness, M. W. Markham, graduated in 1954 from Oklahoma State University with a degree of Veterinary Medicine. He immediately moved to Platte, S. D., and established a veterinary practice there. In 1960 he and his brother-in-law, Jimmy Willis, established Markham Homes, Inc., and engaged in building shell homes in the northeast Oklahoma area using their own capital. By 1962 most of the capital was obligated in the shell home financing. He decided to sell the shell home mortgages owned by Markham Homes, Inc., to savings and loan associations. Accordingly he sold the veterinary practice in South Dakota and moved to Pryor, Okla., where he and his brother-in-law established a lumberyard. In searching for outlets for shell home mortgages, he was told about Peoples Loan & Investment Company (PL&I) of Fort Smith, Arkansas, which had bought mortgages from American Home Builders, Inc. (AHB), likewise engaged in the construction of shell homes. In the spring of 1965 he contacted the witness Austin Gatlin at his home in Mountainburg, Ark. He discovered that Gatlin had purchased the controlling stock of PL&I in 1961 and had operated it through July 1, 1964, when he sold his stock to Sexton, Hall and Smith in 1964 for $500,000 cash, and that Sexton had

become President of PL&I. Because of the experience that Gatlin had had in the organization and operation of finance mortgage companies, he was employed by Markham to set up a finance or mortgage company. At that time Markham decided that the company would be established at Springdale, Ark.

In July or early August 1965, Markham and Willis called on Sexton at the office of PL&I, and advised Sexton that they were in the shell home business in Oklahoma and were unable to secure financing for houses that they could sell. They wanted to discuss with Sexton a program for financing their shell homes. Subsequent to that conversation, Sexton learned from Gatlin that he was going to set up a finance company for Markham and that they wanted copies of the form file. Further conversations were held with Sexton which led to a proposal by Sexton to sell AHB exclusive of PL&I, the controlling stock of which was owned by AHB. Later offers to sell AHB, together with the controlling stock of PL&I, were made, and Markham decided to purchase AHB. The method or procedure to follow to complete the purchase was fully considered by Markham and Gatlin, and they decided to organize a new corporation, Investors Thrift Corporation, and to purchase all of the capital stock of AHB which also owned PL&I. Markham had connections in South Dakota with affluent persons who he thought would readily subscribe for the stock of Investors Thrift. Acting upon this assumption, Gatlin proceeded in accordance with his employment by Markham to organize the new corporation. The total amount invested in Investors Thrift by defendants and others not parties herein is $947,300.00, which includes the amounts borrowed from plaintiff bank.

The original incorporators of Investors Thrift met at the home of Gatlin on August 10, 1965. The minutes of that meeting show that the defendants H. T. Ringling, Robert Carter and Andy D. DeHaan were present in person, and that the defendant Ilo Vanderboom and one

R. S. Miskimins were present by their proxy, M. W. Markham. (Miskimins is not a defendant in the instant action, but is a defendant in an action by plaintiff in the Circuit Court of Sebastian County, Ark. In that suit Miskimins has made the same admissions and filed the same counterclaims as the defendants here.) The minutes of the first meeting of Investors Thrift show that at that time Ringling and Carter each subscribed for 60,000 shares; DeHaan for 150,000 shares; Miskimins for 100,000 shares; and Vanderboom for 40,000 shares, in the new corporation. Markham then began to finalize the purchase of AHB which, as heretofore stated, controlled PL&I. A proposed purchase agreement was drafted dated Sept. 2, 1965, but it was not executed, and another contract dated Sept. 9, 1965, was drafted and submitted by Markham to Sexton, who, after redrafting several pages, agreed to it, and the contract was signed by Sexton, Hall and Smith as sellers and by Markham for Investors Thrift as buyer. A true copy of the contract is attached to the affidavit of Sexton which is exhibit 2 to the motion of plaintiff.

By the terms of the contract Sexton, Hall and Smith agreed to sell Investors Thrift all their interest and ownership and control of certain companies specifically named in paragraph 1 of the contract, and granted to Investors an option to purchase the same upon the terms and conditions set forth in the contract. The consideration for the option recited in the contract as $150,000 was paid to the sellers. The amount paid was actually only $50,000, as $100,000 was refunded to Markham to be divided between Markham and Gatlin in the form of stock in Investors. The option and sale agreement gave Investors from Sept. 9, 1965, until January 10, 1966, to determine if Investors desired to consummate the sale by paying the balance of the contract price of $857,500.00, of which $157,000 was paid to Sexton, Hall and Smith, and a balance of $700,000 to Texas Capital Corporation to pay the sellers' debt to that company.

The contract further provided that as of the date of the contract Markham should become General Manager of AHB, which he did and has remained so from that date.

"The parties specifically agree that until January 10, 1966, or until the exercise of said option, whichever is sooner, Smith shall continue in his capacity as President of AHB, and Sexton shall continue in his capacity as Chairman of the Board and General Manager of PL&I; provided that Austin Gatlin shall be and act as consultant for PL&I, commencing September 15, 1965, at a monthly salary of One Thousand Five Hundred and No/100 Dollars ($1,500.-00), and Sexton shall perform no act in said capacity without Gatlin's approval; and M. W. Markham shall perform the duties of General Manager of AHB, effective on the execution hereof."

The option was exercised on November 2, 1965, or 69 days sooner than the time granted in the contract. On pages 6 and 7 of the affidavit of Markham, the following statement appears:

"On September 7, 1965, Jim Tuttle, a certified public accountant, with Glenn Davis and Company of Muskogee, Oklahoma, made a preliminary survey of American Home Builders, Inc., and Peoples Loan and Investment Company, at the request of Markham Homes, Inc. As a result of his survey, he advised me that with their available personnel, it would take at least six (6) months to complete an audit of Peoples Loan and Investment Company and American Home Builders, Inc., and that a minimum of three (3) months would be required regardless of the number of personnel employed to do the work.

"Betsy Willis, my sister and bookkeeper for Markham Homes, Inc., continued to advise Jimmy Willis, her husband, and me that we should have an audit made before closing the transaction."

The State Bank Department had a continuous record of examinations or audits of PL&I, and these records were in the files of PL&I and AHB. Gatlin advised Markham to have the records carefully checked and verified.

At the request of Markham, Sexton obtained a letter from the State Bank Department. The letter, dated October 19, 1965, signed by the State Bank Commissioner, appears in the record and states:

"This letter is to certify the Peoples Loan & Investment Company has a certificate of authority under Act 111 to operate an industrial loan institution supervised by the State Bank Department.

"At the present time, there is no assessment due the Department which has not been paid. The Company is conforming to the Act under which it is operated, including rules and regulations."

Also, another letter of the same date was written by Clint Jones, Securities Commissioner, in which he stated:

"This is to advise that our records disclose Peoples Loan and Investment Company, Fort Smith, Arkansas, is registered as an industrial loan institution under Act 111 of 1941. This authority is currently in effect, and the corporation is operating under this authority issued by the State Bank Department of the State of Arkansas.

"They filed regularly semi-annual reports with our Department and, as far as our records disclose, they are operating in strict compliance with the above-mentioned Act under which they are authorized in the State of Arkansas."

It is undisputed that Ilo Vanderboom, one of the defendants, spent several weeks in Fort Smith examining the books and records of both corporations, and did not discover any errors or omissions. Markham says in his affidavit that Vanderboom "was not looking for any."

For reasons best known to the defendants, Investors Thrift exercised its option by paying to Sexton, Hall and Smith the $157,000 as heretofore stated on or before November 2, 1965, instead of waiting until January 10, 1966.

Markham and the defendants took no action to obtain an independent audit of the accounts of the two corporations until they had been in full possession and operation approximately 19 months.

Sometime subsequent to November 2, 1965, the date defendants exercised their option to purchase AHB, Markham, in conjunction with Gatlin, decided that additional funds or capital were required. In order to raise a portion of the additional funds, the defendants renewed their notes, paid interest, executed new notes, and asked for and were granted extensions.

The actions and dates thereof of the defendants relative to the notes upon which plaintiff bases its claims are admitted by the defendants, and are as follows:

In No. 2103, Vanderboom obtained his first loan of $15,000 from plaintiff on October 29, 1965, and increased it to $25,000 on December 31, 1965. He made partial payments of principal of $2,500 on February 8, 1966, and on June 5, 1967, of $1,944.46, and also on June 5, 1967, signed the last agreement to extend the note to September 1, 1967, and paid interest to June 5, 1967;

In No. 2104, DeHaan Livestock & Grain Farms, Inc., obtained its first loan of $90,000 from plaintiff on October 29, 1965, and increased it to $105,000 on January 10, 1966. This defendant made a partial payment of principal of $26,-250.00 on June 27, 1966, and of $8,750.00 on June 5, 1967;

In No. 2105, Ringling obtained his first loan of $10,000 from plaintiff on October 29, 1965, and increased it to $50,000 on December 31, 1965. He made a partial payment of principal of $5,555.56 on May 30, 1967, and on June 5, 1967, executed an extension agreement, extending maturity of the note to September 1, 1967;

In No. 2106, Nachtigal obtained his loan of $50,000 on February 29, 1966, after being flown to Fort Smith by Markham, and made a partial payment of principal of $4,166.66 on June 13, 1967, when he also executed an extension agreement, extending the maturity to September 1, 1967;

In No. 2107, Carter obtained his first loan of $25,000 from plaintiff on October 29, 1965, and increased it by $15,000 on January 10, 1966, and on February 9, 1966, consolidated the loan into one note for $40,000. He made partial payments of principal of $5,000 on May 2, 1966, and of $2,777.78 on June 5, 1967, when he also signed an extension agreement, extending maturity to September 1, 1967.

*Notice to Bank of the Alleged Fraud*

The court is convinced that the record before it establishes that there is no genuine issue as to any material fact in the controversy between the plaintiff bank and the defendants. Therefore, the question arises as to whether the plaintiff under the facts is entitled to a judgment as a matter of law.

Most of the material facts have hereinbefore been set forth, but in the consideration of the question as to whether plaintiff is entitled to a judgment as a matter of law, other undisputed facts will be mentioned.

It is not disputed that Hall, Sexton and Smith owned the controlling capital stock of AHB and PL&I, subject to an indebtedness owed to the Texas Capital Corporation. Hall and Sexton have testified by way of deposition, and each of them has submitted an affidavit. Smith has not appeared since he is presently in Vietnam.

Sexton had no connection with the bank other than as a depositor and possibly a creditor. Hall was a vice president of the bank, and the defendants contend that he had full and complete knowledge of the financial condition of the two corporations; that he concealed the true financial condition of the corporations and misrepresented to them and to their agent the facts relative to

the financial condition of said corporations; that such knowledge possessed by Hall was imputed to the bank and the bank became liable to them for the alleged fraud and concealment of Hall; and that the notes sued on should be cancelled.

In considering these contentions, it may be assumed that Hall and Sexton did not disclose all of the facts known by them as to the real financial condition of the two corporations, but there is no proof that the bank had knowledge of the alleged concealed facts, if any, or knew of any misrepresentations, or that a fraud upon the defendants was about to be committed by Hall and Sexton.

It may be inferred from all the facts that once the money was available, Markham decided to begin operations and dispose of the mortgages not only of AHB but also of Markham Homes, Inc. The question of how Markham managed the business is not material to the question herein before the court.

It is undisputed that the defendants applied to Mr. Smoot for the loans. He required financial statements from each of the defendants, and was advised by them that they intended to use the money for the purchase of the capital stock of Investors Thrift Corporation, which had been organized or would be organized to purchase the capital stock of AHB and PL&I. In response to interrogatories submitted to Mr. Smoot, he stated that he had had some conversations with some of the defendants in person or by telephone. Interrogatories 15 and 16 inquired of Mr. Smoot as to the financial condition of AHB and PL&I. Mr. Smoot responded by stating that although the term "financial condition" is a matter of opinion, as far as he knew both corporations were considered to be good, but that he could not answer as to the knowledge of other officers of the bank; that he had no knowledge of Hall's interest, if any, in the loans; that Hall, in a conversation with him relative to the application of defendants for the loans, stated in substance that because of his personal interest he could not and would not participate in the making of these loans; that the matter was up to him to use his own judgment whether he wanted to make the loans or not. "My recollection is that at the time that this was discussed, Mr. Hall used these words, 'I couldn't care less whether the loans are made or not,' or words very similar."

The general rule is well stated in 10 Am.Jur.2d, Banks, § 163, at page 153, as follows:

"The broad general rule that knowledge acquired by, or notice communicated to, an officer or agent of a corporation while acting in his official capacity or within the scope of his duties will be imputed to the corporation, is fully applicable to banking corporations. Hence, subject to certain well-recognized limitations and exceptions, where a director or an officer has knowledge of material facts respecting a proposed transaction, which his relations to it as representing the bank have given him, it becomes his official duty to communicate that knowledge to the bank, and he will be presumed to have done so and his knowledge will be imputed to the bank * * *."

With respect to certain types of knowledge, specifically knowledge of a fraudulent scheme, the authors in § 167 at page 155 state:

"It is a well-settled exception to the general rule regarding the imputation to the bank of the knowledge of its officer or agent that when the officer or agent of a bank is acting in a transaction in which he is personally or adversely interested, either in the legitimate transaction of his own business at the bank of which he is an officer or agent, or when engaged in the perpetration of an independent fraudulent transaction which it would be to his interest to conceal, the bank is not chargeable with his uncommunicated knowledge of facts derogatory to such interest or to the title of property which is the subject of the transaction,

unless such officer or agent is the sole representative of the bank. This exception—namely, where the officer or agent of a bank is acting for his own interest, either adversely or fraudulently—has been applied where the officer interested was the president, the cashier, the president and cashier, a vice president, or a director of the bank, and it has also been held to apply to a promoter of the bank. Accordingly, when an officer or director of a bank offers a note for discount, the bank is not charged with his knowledge affecting the validity or effectiveness of the note. A bank is not charged with notice of the falsity of representations made by its officers or employees to induce a third person to loan money to a corporation in which they were interested, although part of the loan was used to reduce the corporation's debt to the bank. Likewise, a bank, in accepting its president's check on account of a previous overdraft made by him, is not chargeable with notice that he is insolvent and indebted to the bank on which the check is drawn, it being to the president's interest to conceal such facts from the bank. Indeed, the fact that the president of a bank owns its entire capital stock and manages its business does not charge the bank with notice of an attempted appropriation of bank assets by such president to his individual debts. The knowledge of a bank vice president in wrongfully pledging bonds of a customer on a speculative margin account of his own is not imputable to the bank. A bank cashier's knowledge of his own unlawful acts is not imputed to the bank or its officers. The view has also been taken that although when an officer of a bank misappropriates the funds of a depositor and converts the money to his own use the bank is not chargeable with his knowledge, yet if the money misappropriated is received by the bank into its general funds, the bank is chargeable with the knowledge as to how that money was obtained;

otherwise, those dealing with the bank would be remediless against it in case of fraud or misappropriation on the part of an officer."

In §§ 169 and 170, 10 Am.Jur.2d, Banks, there is a rather full discussion of whether knowledge acquired by a bank officer, in his private capacity and not while acting for or on behalf of the bank, will not be imputed to the bank. In § 170 it is stated:

"Where a person is a director or other officer of a bank and also an officer of another corporation, knowledge acquired by him in the latter capacity will not, as a general rule, be imputed to the bank. * * * Where a corporation and a bank have an officer in common and the former is obtaining a loan from the latter, the knowledge of the common officer of a lien on security given for the loan or of his intent to misappropriate the proceeds of the loan will not be imputed to the bank of which he also is a director or officer."

In Munroe v. Harriman (2d Cir. 1936), 85 F.2d 493, 111 A.L.R. 657, the court explained how an officer involved was a sole representative of the bank. Speaking at page 496, the court stated:

"In the case at bar, however, Harriman's domination was exerted to affect the action of the bank with respect to the particular transaction. His will alone caused the making of the loan and the acceptance of the collateral."

■ Without doubt, Edward H. Smoot, President of the bank, represented the plaintiff in the making of the loans. No doubt Hall knew that the defendants had applied for the loans and expected to benefit therefrom, but it is equally certain that he did not reveal the alleged fraudulent scheme, if any, to the bank or to Mr. Smoot. The bank acted in good faith in making the loans. Thus, even if there was a fraud committed by Hall and his associates, the knowledge of Hall and his associates cannot be imputed to the plaintiff bank.

In Great American Indemnity Co. v. First National Bank of Holdenville (10 Cir. 1938), 100 F.2d 763, the court cited with approval and quoted at pp. 756–766 from Aetna Casualty & Surety Co. v. Local Building & Loan Ass'n, 162 Okl. 141, 19 P.2d 612, 86 A.L.R. 526, as follows:

" 'In this connection it is the general rule of law that the knowledge of an agent is imputed to the principal. The reason for this rule, recognized by most courts, is that it is presumed the agent will communicate his information to the principal. This reason has been criticized by some eminent authorities who urge that the real reason is based upon broader ground of policy and expediency to safeguard the affairs of business and society. Pomeroy on Equity Jurisprudence, 94th Ed. vol. 2, par. 676.

" 'Regardless of the reason for the rule, there is universally recognized exception; namely, that the knowledge of the agent will not be imputed to the principal when such knowledge concerns a transaction in which the agent is "Engaged in the commission of an independent fraudulent act on his own account and the facts to be imputed relate to this fraudulent act." 21 R.C.L. page 844.

" 'The reason for this exception recognized by the authorities which place the reason for the rule upon the basis of presumed communication is that where the agent is committing a fraud it would be contrary to common sense to presume that he would communicate the facts to his principal. The reason for the exception, recognized by the authorities who place the rule upon the ground of expediency and policy, is that when engaged in the perpetration of a fraud, the agent is not really acting for his principal, but is really acting for himself entirely outside the scope of agency. * * * The plaintiff * * * states that there is a qualification to the exception, or exception to the exception, the gist of which is that where the agent, though engaged in perpetrating an independent fraudulent act on his own account, is the only representative of the principal, his knowledge is imputed to the principal, falling within the general rule imputing knowledge to the principal. * * * Campbell was not the only agent of the defendant in the transactions. * * * The checks mailed to Oklahoma City were received and placed in the process of clearance in Oklahoma City by other agents of the defendant company. * * * Therefore, it seems to us obvious that with the proper application of the rule the qualification mentioned above has no bearing on this case, for the reason that in the receipt of the money by the defendant company the agent Campbell was not the only agent of the defendant connected with the transactions. We therefore hold in this connection that the knowledge of the agent Campbell was not imputed to the defendant.' "

See, Schram v. Burt (6 Cir. 1940), 111 F.2d 557, 564; Anderson v. General American Life Ins. Co. (6 Cir. 1944), 141 F.2d 898, 907–909.

In American National Bank of Nashville v. Miller (1913), 229 U.S. 517, 33 S.Ct. 883, 57 L.Ed. 1310, the court held that knowledge of fraud of an officer will not be imputed from even the controlling officer, unless it was his duty to disclose same and concealing the information would not be to his personal benefit.

Mr. Justice Lamar, in writing for the court, beginning at page 521 of 229 U.S., at page 884 of 33 S.Ct., said:

"This presents another phase of the oft-recurring question as to when and how far notice to an agent is notice to his principal. In view of the many decisions on the subject it is unnecessary to do more than to apply them to the facts of this case. If Plant, within the scope of his office, had knowledge of a fact which it was his duty to declare and not to his interest to conceal, then his knowledge is to be treated

as that of the bank. For he is then presumed to have done what he ought to have done and to have actually given the information to his principal.

"But if the fact of his own insolvency and of his personal indebtedness of the Nashville Bank were matters which it was to his interest to conceal, the law does not by a fiction charge the Macon bank, of which he was president, with notice of facts which the agent not only did not disclose, but which he was interested in concealing.

"Plant was a private banker in Macon and as such indebted to the First National Bank of Macon, of which he was president and so far dominated as to compel it to take care of the large balances against him in the clearing house, frequently more than 50 per cent. of the $200,000 capital of the Macon bank. On May 13th Plant was indebted to the Macon bank on this account between $75,000 and $100,000. A national bank examiner was in the city and it was expected that he would examine the books of the Macon bank within a few days, when this illegal overdraft by the president would appear. Rev.Stat., § 5200; Evans v. United States, 153 U.S. 584, 14 S.Ct. 934, 38 L.Ed. 830. Plant thereupon gave the bank checks and commercial paper to pay the balance. It was to his personal interest to conceal any fact which would prevent the Macon bank from receiving paper in satisfaction of a debt which had been unlawfully contracted by reason of his official position. An element of that interest was that he should conceal not only the fact of his insolvency but the fact of his indebtedness to the Nashville bank, lest the Macon bank should thereby refuse to take the $3,000 check at its face value. Without, therefore, inquiring as to what would have been the duty of the Macon bank had it known of Plant's insolvency and indebtedness on the $50,000 drafts, we hold that as it had no such knowledge in fact it was not charged with such knowledge in law."

Since the jurisdiction of the court depends upon diversity and the amount involved, the substantive law of Arkansas is controlling.

In Poch v. Taylor (1932), 186 Ark. 700, 55 S.W.2d 74, in an action on a note defended on the grounds that the loan was made to purchase stock in a corporation of which the bank officials were officers, the court, in holding for the bank on the note, said at page 701 of 186 Ark., at page 74 of 55 S.W.2d:

"He [appellant] insists also that the court erred in not holding the note was executed without consideration and void upon the assurance of the officers of the bank that he would never have to pay it. He admits, however, that he executed the note and the money was loaned him by the bank with which to purchase stock of an ancillary or auxiliary corporation, of which the bank officials were officers and who assured him that he would never have to pay the note, and that the dividends from the stock of the new company would take care of the loan. The stock was issued to him upon his purchase thereof, and he continued to renew the old note and pay the interest thereon until the execution of the note sued on herein, the last renewal of the note given. He borrowed the money, however, and admitted that he had never repaid it, and there could be no failure of consideration so far as the loan of the money upon the note discounted was concerned since he got the value of the money for which the note was executed. The fact that the stock purchased with the money he received on the note finally proved to be without value did not constitute failure of consideration for the note executed for the loan; and, even if it were true, which is not shown, that the bank officials made fraudulent representations to him to induce him to take stock in the ancillary company and loaned him the bank's money for that purpose, he would still be bound to the payment of the money loaned upon this note, since the bank

officers had no authority, and could have none, to lend the bank's money to enable persons, who desire to do so,' to buy stock in the ancillary corporation, of which they were also officials. This could not be done even though they had attempted to guarantee, which was not done, sufficient returns upon the stock purchased to take care of the repayment of the money loaned. Clements v. Citizens' Bank of Booneville, 177 Ark. 1085, 9 S.W.2d 569."

Thus, even if Hall concealed material facts from the defendants in that Hall, Sexton and Smith had formed a fraudulent scheme to sell AHB and PL&I, under the general law and law of Arkansas, the knowledge of this scheme was not imputed to the plaintiff bank, and such concealment is not a defense to the notes executed by defendants.

### The Charge that Bank Aided and Abetted Hall, Sexton and Smith in Committing a Fraud

■ The defendants alleged that the plaintiff bank had violated § 10(b) of the 1934 Act, 15 U.S.C.A. § 78j(b), and Rule 10b–5, Title 17, § 240.10b–5, p. 334, Code of Federal Regulations.

Sec. 78j, supra, provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\*    \*    \*    \*    \*    \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, was promulgated to aid in the enforcement of § 78j, supra. The first paragraph of the rule is the same as the first paragraph of § 78j. Sub-paragraphs (a), (b) and (c) of the rule provide:

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."

Sec. 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) provides in part:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud."

The short answer to defendants' contention is that the plaintiff bank did not sell or offer to sell any security of any kind to the defendants. The defendants approached the bank and expressed a desire to borrow money which they, of their own volition, intended to use in the purchase of the capital stock of a corporation, Investors Thrift Corporation, organized by themselves. When the proceeds of the notes were delivered to the defendants, the money belonged to them and they could use it in any manner. The fact that they purchased the stock of and from their own corporation with the proceeds of the notes is not sufficient to hold the plaintiff bank liable under the undisputed facts as found and commented upon by the court.

There is no testimony to show that the plaintiff bank used the mails or any other instrument of interstate commerce in loaning this money.

In Rosen v. Albern Color Research, Inc. (E.D.Pa.1963), 218 F.Supp. 473, the court stated at page 476:

"So far as we perceive, Congress did not undertake to regulate those transactions effected by direct person-to-person contact and negotiation. We are not here concerned with abstract considerations of power, but with actual manifestations of Congressional purpose and intent."

The Court of Appeals for the Eighth Circuit in Myzel v. Fields (1967), 386 F.2d 718, criticized the discussion in the Rosen case of the use of the mails or other facility of interstate commerce, but did not criticize the above quoted statement.

In Little v. United States (8 Cir. 1964), 331 F.2d 287, the court at page 292 said:

"The 'evil at which the Securities Act is directed is the fraud in the *sale* of securities.' United States v. Cashin, 281 F.2d 669, 674, (2 Cir. 1960). That being the congressional purpose and intendment to be covered by the 'Securities Act of 1933,' *a fortiori,* the law of 'sales' and impact of fraud in relation to 'sales,' rather than the principles of 'banks and banking' or 'bills and notes,' should be considered in making practical application of that Act to a given set of facts. In other words, it is our opinion that a scheme to defraud, in relation to a sale of securities, and the use of the mails in consummation thereof, is the gist of the crime denounced by the Congress in Section 17(a) of the Securities Act of 1933, supra. Under that Act, the use of the mails need not be central to the scheme to defraud."

The uncontradicted facts show that the only thing the bank did was to loan money to the defendants, which they used to pay for the capital stock of their own corporation, but the bank had no notice whatsoever of any fraudulent scheme which brought into existence the issuer and seller of the stock, Investors Thrift Corporation, or the actions of Investors Thrift in purchasing AHB and PL&I. Therefore, the contention of the defendants that the plaintiff cannot recover on the notes because it loaned the defendants the money with which to buy capital stock in their own corporation is without merit.

*The Contention of Waiver and Estoppel Asserted by Plaintiff*

In its reply to defendants' amended counterclaim, plaintiff specifically pleads that the defendants have waived the defenses and right of action sought to be asserted and are now estopped from raising such defenses by their admission of making partial payments of principal, paying interest, and obtaining extensions of the notes executed by them.

■ Even assuming, and the court does not, that the defendants did not become fully aware of the alleged misrepresentations until the fall of 1967, it is clear that any knowledge obtained by the defendants' agent, Markham, is imputed to them, whether or not he informed them thereof. Bay Aviation Services Co. v. Southland Aviation, Inc. (W.D.Ark.1962), 211 F.Supp. 125; Jackson v. M. F. A. Mutual Ins. Co. (W.D. Ark.1958), 169 F.Supp. 633; 3 Am.Jur. 2d, Agency, § 273. It is equally clear that any knowledge available to Markham through the exercise of reasonable diligence is also imputed to defendants. Trinity Royalty Co. v. Riggins (1940), 199 Ark. 939, 136 S.W.2d 473; 3 Am. Jur.2d, Agency, § 277; 3 C.J.S. Agency §§ 262-263.

Markham became General Manager of AHB on September 9, 1965, with full access to its records. By his own admission, he was advised by Gatlin within a few days thereafter that Sexton might be robbing the company. Gatlin also advised Markham to make a thorough investigation of the assets and liabilities of PL&I and then determine whether or not he wanted to buy it. Huey Smith indicated to Markham about the same time that Sexton should be removed from management of PL&I. On September 7, 1965, Markham was advised by a certified public accountant that an audit

of AHB and PL&I could be completed in a minimum of three months if sufficient accounting personnel were employed. Markham stated in his affidavit that he continued to be advised by his sister, who was the bookkeeper for Markham Homes, Inc., that an audit should be made before closing the transaction. Notwithstanding these warnings, Markham, on behalf of the defendants, exercised the option on November 2, 1965, over two months before it would have expired, thereby gaining control over AHB and PL&I. All of the defendants except Nachtigal executed notes with the plaintiff on October 29, 1965, prior to the execution of the option. Early in 1966, they were informed by Markham that AHB was having financial difficulty, yet defendants Vanderboom and Ringling increased their borrowing on December 31, 1965, and defendants DeHaan and Carter obtained increases on January 10, 1966. Nachtigal obtained his loan of $50,000 on February 29, 1966, after being flown to Fort Smith by Markham. In the following months, all of the defendants made partial payments on the notes, as heretofore set forth. No audit of AHB and PL&I was requested by the defendants until May of 1967, nineteen months after the option had been exercised giving defendants full access to the records. In May of 1967, Mr. Smoot and Leslie Greathouse, representing the plaintiff, went to South Dakota in order to determine what the borrowers proposed to do about a plan of payment. During the meeting Markham told the defendants that Jim Hall had misrepresented things in reference to PL&I and Investors Thrift, that he, Markham, had been misled by Gatlin, and that he could not say what the stock (Investors Thrift) was then worth. Notwithstanding the above, all of the defendants thereafter made partial payments of the notes and signed extension agreements. There is nothing in the record indicating an intention at any time by the defendants to reserve any defenses or that they were induced to execute the notes by any fraudulent representations by any one.

No claim by any of them was asserted until the fall of 1967, two years after they assumed control of the corporations.

■ Under the substantive law of Arkansas the general rule is that the giving of a renewal note or making partial payments with knowledge at the time of false representations on the part of the payee operates as a waiver of that defense, and the maker is thereby estopped from pleading such defenses in an action on the renewal note. Trent v. Johnson (1932), 185 Ark. 288, 47 S.W. 2d 12, 80 A.L.R. 1431 (partial payments); Harrington v. Citizens' Investment & Security Co. (1923), 160 Ark. 320, 254 S.W. 831 (renewal); Sebastian County Bank v. Gann (1915), 121 Ark. 115, 180 S.W. 754 (renewal); Haglin v. Friedman (1915), 118 Ark. 465, 177 S.W. 429 (renewal); Stewart v. Simon (1914), 111 Ark. 358, 163 S.W. 1135 (renewal); 11 Am.Jur.2d, Bills and Notes, § 391. In Anderson v. Tway (6 Cir. 1944), 143 F.2d 95, the court at page 102 made the following statement:

"It is the law that one who renews or makes payment on a note after knowledge of defenses that may be interposed to its collection, waives them. E. H. Taylor, Jr., & Sons v. First Nat. Bank, 6 Cir., 212 F. 898; Fitzpatrick v. Flannagan, 106 U.S. 648, 1 S.Ct. 369, 27 L.Ed. 211; and this extends to payment of interest. Rosenbloom v. Kaplan, 273 Mass. 411, 173 N.E. 522; Brummett v. McGowan, 165 Okl. 59, 24 P.2d 980. It is in reliance upon this rule that the receiver urges the fraud to have been waived by Tway when he made his several renewals of the note and his several payments of interest thereon."

■ Each defendant in his affidavit stated that he had no intention of waiving any defense by the payment of interest, partial payment of principal, and by obtaining extensions of time in which to pay. One cannot, however, prevent a waiver by a mental reservation to the contrary of an intent to waive, where his acts clearly indicate such intent. Re

Schulte Retail Stores Corp., 22 F.Supp. 612 (S.D.N.Y.1937) aff'd Re Walker (2 Cir. 1937) 93 F.2d 281; 28 Am.Jur.2d, Estoppel and Waiver, § 158.

The plaintiff did not in anywise solicit the defendants to execute the notes. The bank did know that the defendants obtained the loans for the purpose of subscribing for the capital stock of Investors Thrift, which was their own creature. There may have been some conversation between some of the defendants and Mr. Smoot, the President of the bank, as to what use the defendants intended to make of the proceeds of the loan, but there is no proof that Mr. Smoot made any representations as to the financial condition of the two corporations. The court has already referred to interrogatories submitted to Mr. Smoot as to his opinion of the financial condition of AHB and PL&I. Interrogatory No. 15 is as follows: "What was the financial condition of American Home Builders as known to the officers of the City National Bank at the time of making the loan or loans sued on herein?" Interrogatory No. 16 makes the same inquiry as to the condition of PL&I. Both interrogatories were answered as follows: "Although the term 'financial condition' is a matter of opinion, as far as the undersigned knew, it was considered to be good. I cannot answer for the other officers."

Evidently the defendants are persons who have been financially successful. Defendants claim they invested a total of $947,300.00, which includes the amounts borrowed from the bank. This would indicate that they used their own judgment in their financial deals, and it is difficult for the court to understand why men of that caliber and experience would blindly follow the judgment of their agent whose judgment they knew was not based upon an audit or an examination of the records of the corporations. No doubt the picture painted by Markham was alluring, and they simply took a chance. The fact that they are dissatisfied is not in itself proof that there was any misrepresentation. Certainly no fraudulent representations were made by the bank, and the bank did not aid or abet in any fraudulent statements, if in fact any were made by anyone. In any event, the inescapable fact is that the defendants' agent, Markham, either knew or by the exercise of reasonable diligence should have known the true condition of AHB and PL&I at the times the partial payments were made and the extension agreements were executed, and such knowledge is imputed to the defendants. They must be held to have waived any fraud in the transaction.

### Is the Bank a Holder of the Notes in Due Course?

The plaintiff, in its reply to the amended counterclaims of defendants, alleged in paragraph 18 that "it is the holder in due course of the note described in the complaint, and as such holds the same free from the claims sought to be asserted by defendants in the amended counterclaim."

The Uniform Commercial Code became effective in Arkansas January 1, 1962, and is incorporated in Ark.Stat.Ann., §§ 85–1–101 to 85–9–507.

Section 85–3–302 states:

"Holder in Due Course.—(1) a holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."

Section 85–3–305 states:

"Rights of a holder in due course.—To the extent that a holder is a holder in due course he takes the instrument free from

(1) all claims to it on the part of any person; and

(2) all defenses of any party to the instrument with whom the holder has not dealt except

(a) infancy, to the extent that it is a defense to a simple contract; and

(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

(c) such misrepresentation as had induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

(d) discharge in insolvency proceedings; and

(e) any other discharge of which the holder has notice when he takes the instrument."

Obviously from the undisputed facts, the bank took the notes in good faith and is a holder in due course.

Each defendant admits that he obtained the money in accordance with the provisions of the note, and under the undisputed facts none of the defendants was under such incapacity or duress as would render the note or notes a nullity. There was no illegality of the transaction between the bank and the individual borrowers. There were no misrepresentations by the bank which induced any of the defendants to execute his note "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." Only fraud as to nature of instrument itself is a defense to action by a holder in due course, and even if Hall had made false statements or concealed facts relative to the sale of the corporations to Investors Thrift, the same is not a defense to the notes.

The motion of plaintiff for summary judgment should be granted, and judgment entered granting the motion and recovery by plaintiff against the individual defendant or defendants in each of the cases for the amount due, including interest as provided in the note or notes, together with costs.

Counsel for plaintiff will prepare and submit precedent in each case to counsel for defendants for approval as to form and amount.